In re Application of Blue Cross.

[Cite as In re Application of Blue Cross (1972), 34 Ohio Misc. 29.]

(No. 72CV-09-2988—Decided December 12, 1972.)

Common Pleas Court of Franklin County.

*Messrs. George, Greek, King, McMahon & McConnaughey* and *Mr. Kiehner Johnson*, of counsel, for petitioners.

*Mr. William J. Brown*, attorney general, and *Mr. David N. Brown*, for respondent.

WRIGHT, J. This is an appeal from an order of the superintendent of insurance denying Blue Cross of Central Ohio a rate increase, pursuant to its application filed under R. C. 1739.051, with respect to a certain class of subscribers. Blue Cross filed a request for a rate increase in June of 1972. A public hearing was held on August 9 and 10, 1972, at which time Blue Cross presented an extensive amount of testimony dealing with the necessity, reasonableness, and fairness of its proposed rate increase. Following this hearing the superintendent of insurance under date of September 7, 1972, denied approval to the Blue Cross application for a change of rates. The full content of the superintendent's letter follows:

"September 7, 1972

"Blue Cross of Central Ohio
174 East Long Street
Columbus, Ohio 43215
"Attention: Mr. Howard C. Franz, President
"Dear Mr. Franz:

"The staff of the Department of Insurance and its professional consultants have reviewed the record made at the public hearings of August 9 & 10, 1972, regarding your proposed rate increase for direct paying subscribers. We have also reviewed your initial proposal and the supporting data supplied by your office.

"We find initially that we cannot agree with your use of certain data in the calculation of the proposed rate increase. To support the requested increase Blue Cross relied extensively on the experience of large group subscribers, which experience is not truly representative of the experience which emerges from direct pay subscribers. Such direct pay experience data was available to Blue Cross and should have been used to a greater extent in the calculation of this rate.

"We have further determined that the direct pay group is unfairly and adversely affected by the disproportionate loss experience resulting from Blue Cross' practice of transferring latent claims of former group subscribers into the direct pay category. We believe that Blue Cross can implement a procedure which will offset this adverse factor and thereby result in a favorable adjustment to the direct pay experience data.

"We further find that Blue Cross has failed to exert any effective influence over its member hospitals to operate more efficiently and has thereby failed to shed its traditionally paternalistic attitude toward the hospitals and assume the position of vigorously representing the interests of its subscribers. Blue Cross has the duty of seeing that its subscribers obtain the best health care possible for their dollar by making every effort to compel member hospitals to effect economies and to monitor utilization.

"We, therefore, for the above reasons and in consider-

ation of all the data and factors involved in the request for approval of the proposed rate increase, find that said proposal is other than fair, lawful, and reasonable and is not supported by sufficient, relevant and material evidence which would justify our approval at this time. The request for approval is therefore denied.

"Sincerely,
"KENNETH E. DeSHETLER
"Director of Insurance
"/s/ E. E. Eckert
"Deputy Director"

Both parties requested that they be allowed to present testimony supplementing the record of the proceedings of August 9 and 10. The requests were granted and the court heard extensive testimony on November 17 and November 22. During the course of the aforementioned supplementary proceedings, the superintendent, through its counsel, withdrew the content contained in the second and third paragraph of the superintendent's letter of September 7, 1972, as grounds for denying the Blue Cross application for a change of rates, thus narrowing the issues in the case to the grounds contained in paragraph 4 of the aforementioned letter. The superintendent, both through his counsel and on the record, asserts that the department of insurance has both the right and the duty to protect Blue Cross subscribers from increased rates due to higher than necessary hospital costs accrued by hospitals doing business with Blue Cross and member hospitals under the contractual relationship as evidenced by the Supplementary exhibits A and B presented by Blue Cross. The superintendent asserts that Blue Cross has failed to properly police and control these costs and therefore a rate increase must be denied. The superintendent concedes by withdrawing the first two grounds for his denial of the rate increase that the change of rates is both necessary, reasonable and fair from an *actuarial* standpoint, but urges that the alleged failure of Blue Cross, as aforementioned, provides a proper and lawful base for promulgating a broad sweeping rule via a rate adjudication.

The state cites the case of *S. E. C.* v. *Chenery Corp.*, 332 U. S. 194, in support of its proposition that the superintendent is entitled to, in effect, make a rule by adjudication. In this case, the appellee argued that at the time the commission made its decision, the S. E. C. had no rule or regulation on which the order was based and that the S. E. C. could regulate only by clearly announced regulations of perspective effect. While the *Chenery* case is most certainly distinguishable upon its facts from the case at bar, it does in fact stand for the proposition enunciated by the United States Supreme Court, at page 202 of that opinion:

"In other words, problems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency."

The court goes on to uphold the acts of the commission. This court would concede that this case seems to support the general posture adopted by the superintendent; however, there are two principal points that occur to this court in holding that this case is inapplicable to the situation at bar. In the majority opinion, the court makes reference to the fact that they had previously affirmed the reversal of the action of the S. E. C. They stated the following at page 196:

"When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is

to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

"We also emphasized in our prior decision an important corollary of the foregoing rule. *If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, 'We must know what a decision means before the duty becomes ours to say whether it is right or wrong.' "* (Emphasis added.)

This court would point out that there is certainly nothing definitive with respect to what the superintendent means in the grounds stated for denying the rate increase.

Secondly, this was a four to two decision by the court. This court feels that some of the comments made by Justice Jackson, joined by Justice Frankfurter in his dissent, worthwhile. In disagreeing with the reasoning of the majority, Justice Jackson states, at page 210:

"It makes judicial review of administrative orders a hopeless formality for the litigant, even where granted to him by Congress. It reduces the judicial process in such cases to a mere feint. While the opinion does not have the adherence of a majority of the full Court, if its pronouncements should become governing principles they would, in practice, put most administrative orders over and above the law."

Justice Jackson continues at page 212:

"The reversal of the position of this Court is due to

34

a fundamental change in prevailing philosophy. The basic assumption of the earlier opinion as therein stated was, 'But before transactions otherwise legal can be outlawed or denied their usual business consequences, they must fall under the ban of some standards of conduct prescribed by an agency of government authorized to prescribe such standards. * * *' S. E. C. v. Chenery Corp., 318 U. S. 80, 92-93. The basic assumption of the present opinion is stated thus: 'The absence of a general rule or regulation governing management trading during reorganization did not affect the Commission's duties in relation to the particular proposal before it.' (Par. 13.) This puts in juxtaposition the two conflicting philosophies which produce opposite results in the same case and on the same facts. The difference between the first and the latest decision of the Court is thus simply the difference between holding that administrative orders must have a basis in law and a holding that absence of a legal basis is no ground on which courts may annul them.

"As there admittedly is no law or regulation to support this order, we peruse the Court's opinion diligently to find on what grounds it is now held that the Court of Appeals, on pain of being reversed for error, was required to stamp this order with its approval. We find but one. That is the principle of judicial deference to administrative experience * * *.

"What are we to make of this reiterated deference to 'administrative experience' when in another context the Court says, 'Hence, we refuse to say that the Commission, which had not previously been confronted with the problem of management trading during reorganization, was forbidden from utilizing this particular proceeding for announcing and applying a new standard of conduct.'? (Par. 17.)

"The Court's reasoning adds up to this: The Commission must be sustained because of its accumulated experience in solving a problem with which it had never before been confronted!

"Of course, thus to uphold the Commission by pro-

fessing to find that it has enunciated a 'new standard of conduct' brings the Court squarely against the invalidity of retroactive lawmaking. But the Court does not falter. 'That such action might have a retroactive effect was not necessarily fatal to its validity.' (Par. 17.) 'But such retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles.' (Par. 17.) Of course, if what these parties did really was condemned by 'statutory design' or 'legal and equitable principles,' it could be stopped without resort to a new rule and there would be no retroactivity to condone. But if it had been the Court's view that some law already prohibited the purchases, it would hardly have been necessary three sentences earlier to hold that the Commission was not prohibited 'from utilizing this particular proceeding for announcing and applying a new standard of conduct.' (Par. 17.)

"I give up. Now I realize fully what Mark Twain meant when he said, 'The more you explain it, the more I don't understand it.'

"But one does not need to comprehend the processes by which other minds reach a given result in order to estimate the practical consequences of their pronouncement upon judicial review of administrative orders.

"If it is of no consequence that no rule of law be existent to support an administrative order, and the Court of Appeals is obliged to defer to administrative experience and to sustain a Commission's power merely because it has been asserted and exercised, of what use is it to print a record or briefs in the case, or to hear argument? Administrative experience always is present, at least to the degree that it is here, and would always dictate a like deference by this Court to an assertion of administrative power. Must the reviewing court, as this Court does in this opinion, support the order on a presumptive or imputed experience even though the Court is obliged to discredit such experience in the very same opinion? Is fictitious experience to be conclusive in matters of law and particularly in the interpretation of statutes, as the Court's opinion now in-

timates, or just in fact finding which has been the function which the Court has heretofore sustained upon the argument of administrative experience?

"I suggest that administrative experience is of weight in judicial review only to this point it is a persuasive reason for deference to the Commission in the exercise of its discretionary powers under and within the law. It cannot be invoked to support action outside of the law. And what action is, and what is not, within the law must be determined by courts, when authorized to review, no matter how much deference is due to the agency's fact finding. Surely an administrative agency is not a law unto itself, but the Court does not really face up to the fact that this is the justification it is offering for sustaining the Commission action."

This court can simply not accept the proposition that any action taken by the administrative agency supported by little more than the views on policy held by the particular administrator in office and absent legal guidelines is to be approved.

The *Chenery* decision is "policy based law" reigning supreme, finds little or no support in the case law of the state of Ohio and finally, as indicated ante, is of doubtful application to the case at bar.

There is no reported case law construing the scope of R. C. 1739.051 in the state of Ohio. This is a case of first impression in this state and extensive briefs have been provided by both parties. Blue Cross suggests that the dearth of case law on the posture adopted by the superintendent is due to the fact that no superintendent has had the temerity to make such a bold assertion of administrative power. Blue Cross argues that the superintendent is, in essence, legislating in the area of basic policy and thereby acting in an unlawful manner.

There is but one reported case which bears directly on one of the principal issues in this case. That is to say, the question whether or not the superintendent has the right and/or the responsibility of inquiring into hospital costs in the course of acting upon an application for a change of rate. This is the case in *Thaler* v. *Stern*, 44 N. Y. Misc. 2d

278, 253 N. Y. S. 2d 622. This case, by way of dicta, does in fact stand for the proposition that the superintendent has this responsibility and this decision does bear analysis and discussion.

Before undertaking such discussion, it should be noted that there are two other issues in this case and that is that even if one adopts the superintendent's position that he has the aforementioned right and responsibility, the question still arises as to whether or not a denial of the rate application should lie where a rate increase is actuarially necessary and reasonable, and whether the record in this case supports by reliable, substantial and probative evidence the assertion that "Blue Cross has failed to exert any effective influence over its member hospitals to operate more efficiently" and that Blue Cross has failed in its responsibilities to its subscribers through a paternalistic attitude and is not vigorously representing the interests of its subscribers.

*Thaler, supra,* was decided following the filing of a petition to review and annul the determination by the superintendent of insurance of the state of New York approving an increase in premium rates of the American Hospital Service of New York (AHS), a non-profit hospital service corporation organized under statutes similar to those which led to the creation of Blue Cross. Joining the petitioner in attacking the superintendent's determination were various groups whose members constituted a substantial number of AHS subscribers. The determination by the superintendent that a rate increase was appropriate followed a review by the superintendent of the results of a public hearing. The public hearing contained the results of a 1961 triennial audit, annual financial and statistical reports by hospitals, annual financial and statistical statements by proprietary hospitals, medical and dental service, and up to date test checks. The court held that the superintendent had before him enough information to demonstrate that the increase was necessary in order to maintain the financial integrity of AHS. Petitioner argued that the superintendent of insurance had the duty to examine into the reasonableness and propriety of pay-

ments made to member hospitals by the service in the course of his inquiry into the propriety of the requested rate increase and that the failure by the superintendent to inquire into the reasonableness of rates, even though mathematically correct, amounted to such a dereliction of duty as to support an order annulling the superintendent's action. The basic questions before the court were whether the superintendent failed to perform a duty enjoined upon him by law, and/or whether the superintendent's determination was made in violation of lawful procedure, was affected by an error of law, or was arbitrary and capricious or an abuse of discretion. The superintendent took the position that he had neither the right, nor the duty to make a determination of whether or not the rates charged by the member hospitals were excessive. The following are excerpts from the court's opinion:

"The Court finds merit in much of petitioner's argument, and were this the ordinary rate increase situation, might well conclude that the Superintendent's action was unreasonable. The Superintendent is required by law to examine into the affairs of AHS 'at least once in every three years' (Insurance Law, Sec. 28, Sbd. 2, par. (a)). Choosing to do the very least required, he conducts but one audit every three years, regardless of the frequency of rate increase requests." (284, 254 N. Y. S. 2d at 629.)

"The Superintendent's conception of his functions and duties is most clearly pointed up in respect of the question of rates of payment to member hospitals. Arguing from the language in *Matter of Old Republic Life Ins. Co.* v. *Wikler, Supt. of Ins.*, 12 A. D. 2d 310, 211 N. Y. S. 2d 79, affd. 9 N. Y. 2d 524, 215 N. Y. S. 2d 481, 175 N. E. 2d 147, approving, in principle, the use of a formula or schedule in passing on the statutory standard of reasonableness of rates, the Superintendent contends that he is under no obligation, legal or otherwise, to re-examine the hospital reimbursement formula set up in 1960 under Insurance Law, Sec. 254 (2), whenever AHS seeks a new increase in subscriber rates under Insurance Law, Sec. 255 (2)." (285, 253 N. Y. S. 2d at 630.)

"What may have seemed proper and feasible in theory

in 1960 might well prove to be unworkable and impractical in 1964. It would be clearly unreasonable for the Superintendent to approve increases in rates of payment to hospitals solely on the basis of the mechanical application of a mathematical formula, if that application were in total disregard of changing circumstances affecting the basic scheme and in total disregard of possible perversion of the scheme by its participants. Nor is it any more reasonable for the Superintendent to attempt to pass upon requested subscriber rate increases without giving any consideration to the adequacy and reasonableness of hospital repayment rates. The relation between the two is elemental. There would be no need for subscriber rate increases were it not for two factors: firstly, there has been a significant increase in utilization of hospital services by AHS subscribers and secondly, and more importantly, there has been a tremendous increase in the reimburseable cost of hospital services." (286, 253 N. Y. S. 2d at 630.)

"However, in spite of the mass of statistical information the Superintendent is able to marshal, petitioner points to a basic flaw in the handling of this matter which makes any such consideration unreasonable. The Superintendent does not and will not examine into the reasonableness and propriety of payments made to member hospitals by AHS. Taking refuge behind the strict letter of the law, he asserts that it is his duty to determine the reasonableness of 'rates' of payments, nor reasonableness of payments themselves." (286, 253 N. Y. S. 2d at 631.)

"Indeed, he argues that he does not even set rates of payments—AHS does this—he only approves them. This last, a distinction without a difference, is belied by the very action here challenged." (Page 631.)

"The Superintendent, meanwhile, would have us believe that he is to play absolutely no part in supervising or controlling this plan. He would have us believe that it is none of his concern whether payments are based on mistaken facts, fictitious charges, fictitious employees or even fictitious patients; nor that he should be concerned with making any independent evaluation of the reasonableness of capital cost appraisals, rental expenses, salaries and

fees of owners of proprietary hospitals or any of the myriad other details which would require him to go beyond the four corners of balance sheet and ledger book.'' (288, 253 N. Y. S. 2d at 633.)

''We reject the restrictive interpretation the Superintendent puts upon his authority. Surely, we must conclude, by implication if not otherwise, that the Superintendent has been empowered to do all that is reasonably necessary to fulfill the duties imposed upon him.'' (289, 253 N. Y. S. 2d at 633.)

The court went on to reject the proposition as advanced by the superintendent; i. e., that he had no duty in supervising or controlling the AHS plan regardless of whether payments were made on mistaken facts, fictitious charges, fictitious employees, or even fictitious patients. The court rejected the restrictive interpretation that the superintendent urged with respect to his authority and embraced the idea that the superintendent was empowered by implication, if not otherwise, to review hospital costs as part of his administration. The court held that the superintendent was charged, not merely with the responsibility of seeing that the AHS plan was run honestly, but efficiently as well. Following this long dissertation on the duties of the superintendent, the court dismissed the petition holding that the superintendent acted prudently in exercising his discretion in granting the ''temporary financial relief.''

R. C. 1739.051 contains the provision whereby the license of Blue Cross is subject to annual renewal. In addition to this annual renewal procedure, the superintendent appears to have the duty to review the reasonableness of both rates and contracts. This court would agree with the reasoning in *Thaler*, for it was said that the Superintendent of Insurance is not justified in assuming the role of a mere automon blindly approving mathematically correct adjustments.

The state has cited *N. L. R. B.* v. *National Shoes, Inc.*, 208 F. 2d 688, in support of its theory that the alleged lack of will and state of mind of Blue Cross are grounds for rule-making via an adjudication denying a rate increase.

This case and other N. L. R. B. cases cited do not support the superintendent's position for three reasons:

1. The N. L. R. B. was purportedly effectuating a specific legislative purpose that all parties have the duty to bargain in good faith. Here, we have no specific legislative fiat in any way akin to that before the courts in various N. L. R. B. cases.

2. The record was replete with evidence in support of the board's finding that the defendant, in effect, was making a mockery of the aforementioned congressional statement of policy.

Here we have the anomalous situation of counsel for Blue Cross arguing that it has no duty to "control" hospital rates, while presenting a mass of evidence supporting its efforts to "contain" such rates—a difference without a distinction.

3. Finally, while the court accepts the state's basic presupposition that hospital costs have risen markedly in the past ten years, and this is most certainly a matter of genuine concern, there is nothing in the record suggesting "bad faith" on the part of Blue Cross, a basic premise in the cases cited above.

The superintendent has argued that Blue Cross has adopted a "paternalistic" attitude toward its subscriber hospitals and that Blue Cross cannot, in effect, serve two masters—its subscribers and its member hospitals—and, therefore, should adopt a more aggressive or adversary posture with respect to its member hospitals. Without passing on the truth of the matter asserted, this court, for the moment, would agree that certainly, with respect to the reasonableness of the contractual relationships between Blue Cross and its member hospitals, the superintendent does have the right to review this aspect of the relationship. Indeed R. C. 1739.13 gives the superintendent extensive powers with respect to an examination of the affairs of Blue Cross. The legislature recently amended R. C. 1739.04, which provides that no more than one-third of the board of Blue Cross may be made up of individuals who are also directors, trustees, a staff physician, or other-

wise connected with a hospital. R. C. 1739.051 provides that before approving the *contractural* relationship establishing rates to be charged by Blue Cross, he may conduct public hearings as to the wisdom or necessity of same. This same code section provides that the superintendent may retain at the association's expense such attorneys, actuaries, accountants or other experts that otherwise are part of the superintendent's staff as shall be reasonably necessary to assist in the conduct of any public hearing under this section. Reading all of these various sections together, it is obvious that the superintendent does in point of fact have the specific power to pass on the reasonableness of the contractural relationship involved, ready access to the records of Blue Cross, and the right to call in experts to determine whether or not Blue Cross is effectively representing the interests of its subscribers. Accordingly, this court concurs in the fundamental premise announced in the *Thaler* case; however, it does not necessarily follow that the superintendent, through the denial of a rate increase, may accomplish what he appears to be proposing here. For here, at the outset at least, we had a record dealing with the narrow question of the reasonableness of a proposed rate increase. Had this been a hearing on the reasonableness and propriety of the contract between Blue Cross and its member hospitals, the superintendent could certainly have raised the point he so forcefully made in his order. Had this been a hearing on the advisability of renewing or revoking the license of Blue Cross, the superintendent could with propriety have dramatized the frailities of the relationship of Blue Cross and its member hospitals. Both the original record and the supplementary record thereto contain an extensive review of the efforts by Blue Cross to assist its member hospitals in reducing costs, effecting savings through present, and proposed cooperative efforts in purchasing, shared data processing and the avoidance of duplication of facilities. The superintendent argues that the denial of the rate increase here is nothing more than a rule-making process by adjudication, and a modest proposal common to many similarly situated administrative agencies. Counsel for the superintendent refer the court

to a Harvard Law Review article entitled *Rule Making or Adjudication*, 78 Harv. L. R. 921 (March 1965). Counsel for the state argues that the superintendent has no duty to follow the normal procedures and legal trappings as outlined and reviewed ante. His reasoning follows:

"The term rule-making by adjudication embraces all those rules which are created by an administrative agency in the course of publishing an order and findings in a given case. Since the order and findings in a given case indicate with clarity and precision what the policy of an administrative agency will be when it encounters a similar factual situation, these findings and order constitute a rule in every sense of that word. The term rule-making by adjudi-. cation means, then, the net effect on regulatees of the decisions made by regulators when they issue an order and findings pursuant to their adjudicative power to decide a controversy."

"To summarize, an administrative agency has the clear duty to make policy through rules. In making rules, it has two means at its disposal. It can make rules via formal hearings (or it can make rules via formal hearings) or it can make rules by adjudication. What advantages lie in the latter choice?

"To begin with, rule-making by adjudication allows an administrative agency to develop a rule and set a policy gradually. Oftentimes, the agency knows that something has gone awry in the industry it is regulating, and it can point with particularity to the specific facts which caused that occurrence to happen. * * * It is, then, assuming that it must regulate to keep that occurrence from recurring, faced with two alternatives. It can either instigate and proceed to an adjudication of the occurrence under such· law as exists, or it can use its formal rule-making powers to develop a rule to cover the occurrence. This latter alter-- native has an obvious drawback. At the time in question, the administrative agency may not yet have sufficient experience with the occurrence to develop a cogent rule."

"Second, the administrative agency may want to regulate a situation that does not lend itself to regulation by a rule drafted in the abstract but does lend itself to regula-

tion by a rule arising from decided cases. This situation most often arises when the administrative agency is attempting to regulate an attitude or a state of mind in a regulatee.''

''A third reason that an administrative agency might choose rule-making by adjudication is that the desirability for forming a rule may not become apparent for the first time until a given adjudicatory proceeding is well under way. * * * One, the occurrence which indicates the desirability of forming a rule may cry out for immediate regulation. And two, for both reasons discussed earlier it may not be easy to formulate a good rule. If the agency is permitted to proceed to a rule through its present adjudication, both of these problems can be avoided.''

''To summarize, an administrative agency may choose to proceed to set its policy and make its rules via adjudication for at least three reasons. First, it may wish to find rather than make the needed rule. Second, it may be confronted with the necessity of regulating an attitude or frame of mind which cannot be regulated by a formal rule. Third, it may discover the need for the rule in a circumstance that calls for immediate regulation.''

The foregoing, is to say the least, an almost breathtaking exposition of the rectitude of the application of raw administrative power. While the N. L. R. B. cases cited and discussed are interesting, they are certainly not controlling. Here, we have nothing akin to a legislative mandate imposed on the superintendent. There is no labor— management relationship, the superintendent's desire for such to the contrary notwithstanding. Further, where do we find the rule that counsel for the superintendent urges? The net effect of the superintendent's adjudication is that a concededly necessary and reasonable rate increase should not be granted until such time as Blue Cross meets a standard as yet unannounced by the superintendent in anything other than the vaguest of terms. Counsel for the superintendent argue that by granting a rate increase the superintendent would be faced with the situation where he would have to tolerate the present attitude of Blue Cross. Such position simply ignores the remedies available to the super-

intendent as outlined above. This court is not blind nor unsympathetic to the problem of ever mounting hospital costs, but the superintendent's action has no foundation in the law of the state of Ohio.

Further, a careful review of the record and its supplement clearly demonstrates that while there is probative evidence that substantial improvements could be effected within the various member hospitals, there has been a studied effort on the part of Blue Cross toward meeting these problems. The record as it stands reflects that Blue Cross is representing the interests of its subscribers and that efforts are being made to compel member hospitals to effect economies and to effect better health care. It is this court's finding that Blue Cross has demonstrated by a preponderance of the evidence that it is effectively "containing" hospital costs in areas subject to its efforts. The court makes this finding in spite of the denial by Blue Cross that it has the duty to "control" such costs, a position which the court does *not* embrace. Perhaps, a further investigation into the effectiveness of the efforts of Blue Cross in this area would lead to a different conclusion, but the record as it presently stands does not support the conclusions drawn by the superintendent. This court is well aware of the strains that can develop where a court of law attempts to substitute its judgment for the judgment of an administrative agency. A reversal of an act of an administrative agency should not be undertaken lightly. However, in this case, the court has no alternative in light of the procedure followed and the absence of evidence supportive of the superintendent's findings.

Before concluding, this court wishes to compliment counsel for their courtesy and the quality and scope of their briefs. The state's brief is, to say the least, both innovative and imaginative. The court is appreciative of the state's willingness to narrow the issues herein. Thus, a comment of what the court did *not* have before it. The court did not have the issue of the propriety of actuarial necessity for the rate increase denied. The court did not have the issue of whether hospital costs in central Ohio are "too high," other than as a corollary to the propriety

of the superintendent's interest in this matter. The initial hearing and its supplement did demonstrate that both hospital costs and Blue Cross charges rose at a very high rate during the ten years last past. Finally, the court most certainly does not have before it the issue of whether or not Blue Cross is being run competently and honestly, for the superintendent himself indicated that he believed that Blue Cross was a highly sophisticated and efficient organization.

The court certainly did not pass on the superintendent's motivations of sincerity. *It is the means, not the end, which must be prohibited.* The following conclusions should be noted:

1. The superintendent places a pejorative connotation on the admittedly symbiotic relationship between Blue Cross and its member hospitals and would mandate a relationship identical with the collective bargaining process.

2. The wisdom of this stand is not the question here, for the superintendent has the right to his opinions, but in order to effectuate his wishes the superintendent must pursue his course in a manner prescribed by law, and spread upon the record *facts* supportive of such course. This simply was not done here.

3. The record clearly demonstrates that Blue Cross has gone far beyond the relatively narrow terms of its contract in obtaining quality medical care at relatively low costs for its subscribers.

4. This contract and rate formulae Blue Cross works under with its member hospitals has been tacitly approved annually each year since 1962, the last license renewal having been granted less than six months prior to the superintendent's finding of September 7.

To use the rate making process to question the state of mind or will of Blue Cross to represent its subscribers at this point in time, absent clear guidelines with respect to a cure for the alleged evil cannot be condoned.

Accordingly, the order of the superintendent must be reversed and the application must be approved.

*Application approved.*