This is an appeal from a judgment of the Court of Common Pleas of Franklin County sustaining the finding of the Superintendent of Insurance of Ohio, denying a rate increase for appellant's direct pay subscribers applied for by Blue Cross of Northwest Ohio under the provisions of R. C. 1739.051, which provide that if any hospital service association desires to:
"(A) Enter into or amend any contractual relationship with any nonprofit hospital, skilled nursing facility, or a home health agency; *Page 286 
"(B) Issue or amend any subscriber contract for such services;
"(C) Establish or change any group rating experience formula used in determining a group rate charged for a group subscriber contract;
"(D) Establish or change any rate charged for any subscriber contract, other than a group rate for group subscriber contracts determined in accordance with a group rating experience formula which has been approved by the Superintendent of Insurance;
"A copy of the proposed contract, amendment, formula, or rate shall be filed with the Superintendent of Insurance and shall not be effective until the expiration of ninety days after the filing thereof unless he shall sooner give to such association his written approval thereto. If the superintendent is not satisfied within such ninety day period, that any such contract, amendment, formula, or rate is lawful, fair, and reasonable, he shall either so notify such association and it shall thereafter be unlawful for such association to use any such contract, amendment, formula, or rate, or he shall set a date and time for a public hearing to commence no later than ninety days after receipt of said filing. The superintendent shall give public notice of any such hearing. He may also require the association to give public notice of such hearing.
"The superintendent may retain at the association's expense such attorneys, actuaries, accountants, and other experts not otherwise a part of the superintendent's staff as shall be reasonably necessary to assist in the conduct of any public hearing under this section. Such expenses shall not exceed an amount equal to one-hundredth of one per cent of the sum of premiums earned plus net realized investment gain or loss of such association as reflected in the most current annual statement on file with the superintendent. Any person retained shall be under the direction and control of the superintendent and shall act in a purely advisory capacity. The superintendent shall, within thirty days after the commencement of a hearing issue an order either approving any such contract, amendment, formula, *Page 287 
or rate if he finds it to be lawful, fair, and reasonable, or disapproving any such contract, amendment, formula, or rate if he finds it otherwise. At any time the Superintendent of Insurance may, upon at least nintey days written notice to such association, withdraw his approval of any contract, amendment, formula, or rate thereof on any of the grounds stated in this section. Such disapproval shall be effected by written order which shall state the grounds for disapproval.
"Any action taken or order issued by the superintendent pursuant to this section may be appealed by the association as provided for in Section 119.12 of the Revised Code."
Thereafter, the record indicates that a public hearing was held on October 26, 1972, for the purpose of determining whether the proposed rate increase for appellant was lawful, fair and reasonable. Public notice of the hearing was given, and the hearing commenced in Toledo, Ohio, within ninety days after receipt of the filing. Thereafter, the Superintendent of Insurance made the following finding:
"Blue Cross has failed to exert any effective influence over its member hospitals to operate more efficiently and has thereby failed to control spiraling hospital costs in the Northwest Ohio area. Blue Cross must shed its traditionally paternalistic attitude toward the hospitals and assume the position of vigorously representing the interests of its subscribers. Blue Cross has the duty of seeing that its subscribers obtain the best health care possible for their dollar by making every effort to compel member hospitals to effect economies and to monitor utilization.
"As of May 31, 1972, Blue Cross had $13,136.515.02 in contingency reserves. Assuming all other sources of income cease, this is sufficient to pay about 2.87 months of claims. This level of reserves is unreasonably high and can be reduced to a lower level without endangering the plan's operations or solvency.
"The contract between Blue Cross and the hospitals is found generally not to be in the best interests of the subscribers. *Page 288 
For instance, the record indicates no substantial efforts by Blue Cross to amend the contract so that Blue Cross will not pay for a facility or service unless it has been approved by the Hospital Planning Association.
"The group enrollment factor used by Blue Cross is unfair to direct pay subscribers and should be higher than its current. 5%. Implementation by Blue Cross of a higher group enrollment factor will have an advantageous impact on direct pay subscriber income in the new rate year and will by itself significantly reduce the size of the requested rate increase.
"Blue Cross voluntarily reimburses hospitals for bad debts and charity patients, thereby substantially increasing the amount of money which it must collect from its direct pay subscribers. Were Blue Cross to follow Medicare's example and not pay for these costs, it is clear that there would be no necessity for this increase.
"In computing the proposed new rates Blue Cross erroneously used a completion factor of 5%. Use of this erroneous factor had the effect of raising the proposed rates approximately 2.85% above the level they would have been set at had the correct and proper factor been used
"For each of the above reasons, I conclude that the proposed rate increase is other than lawful, fair and reasonable and I therefore deny the application and order that the proposed rates not be implemented."
On appeal from the order of the Superintendent of Insurance under R. C. 119.12, the Common Pleas Court of Franklin County had before it only the record of the proceedings before the Superintendent without any additional evidence by either party. The court in affirming the order of the Superintendent of Insurance made the following finding:
"1. That the Superintendent of Insurance has the right to make rules by adjudication of rate-making proceedings and apply those rules to the adjudication in which they are made. The findings made by the Superintendent of Insurance in this case are:
"a. That Blue Cross has failed to exert any effective *Page 289 
influence over its member hospitals to operate more efficiently and has thereby failed to control spiraling hospital costs in the Northwest Ohio area. Blue Cross must shed its traditionally paternalistic attitude toward the hospitals and assume the position of vigorously representing the interests of its subscribers. Blue Cross has the duty of seeing that its subscribers obtain the best health care possible for their dollar by making every effort to compel member hospitals to effect economies and to monitor utilization.
"b. That as of May 31, 1972, Blue Cross had $13,136,515.02 in contingency reserves. Assuming all other sources of income cease, this is sufficient to pay about 2.87 months of claims.
"c. This contract between Blue Cross and the hospitals is found generally not to be in the best interests of the subscribers. For instance, the record indicates no substantial efforts by Blue Cross to amend the contract so that Blue Cross will not pay for a facility or service unless it has been approved by the Hospital Planning Association.
"d. The group enrollment factor used by Blue Cross is unfair to direct pay subscribers and should be higher than its current .5%. Implementation by Blue Cross of a higher group enrollment factor will have an advantageous impact on direct pay subscriber income in the new rate year and will by itself significantly reduce the size of the requested rate increase.
"e. Blue Cross voluntarily reimburses hospitals for bad debts and charity patients, thereby substantially increasing the amount of money which it must collect from its direct pay subscribers. Were Blue Cross to follow Medicare's example and not pay for these costs, it is clear that there would be no necessity for this increase.
"f. In computing the proposed new rates, Blue Cross erroneously used a completion factor of 5%. Use of this erroneous factor had the effect of raising the proposed rates approximately 2.85% above the level they would have been set at had the correct and proper factor been used.
"2 These grounds offered by the Superintendent for *Page 290 
finding this rate other than fair, lawful and reasonable are proper grounds for so finding, and there is reliable, probative and substantial evidence to support these grounds, and his order is in accordance with law."
It is from this judgment that the appellant brings this appeal setting forth the following two assignments of error.
"1. The affirmance by the Court of Common Pleas of Franklin County of the findings of the Superintendent of Insurance is contrary to Section 119.12, Ohio Revised Code, for the reason that such affirmance is not supported by reliable, probative and substantial evidence found in the record.
"2. The court erred in finding that the Superintendent of Insurance has the right to make rules by adjudication in rate-making proceedings and apply those rules to the adjudication, in which they are made."
We shall consider, first, appellant's second assignment of error. We find no appellate court decisions construing R. C.1739.051. The only prior reported case is the decision of Judge Wright in In re Application of Blue Cross (1972), 34 Ohio Misc. 29, wherein the court reversed the order of the Superintendent of Insurance. There, an attempt was made, as here, at rule making by adjudication. We find no record that this decision was appealed.
The appellee herein relies principally upon the case ofSecurities and Exchange Commission v. Chenery Corp. (1947),332 U.S. 194, wherein a majority of the Supreme Court held that in approving a plan for the reorganization of a holding company under the Public Utility Holding Company Act of 1935, the Securities and Exchange Commission, in its action requiring that preferred stock, purchased by the management without fraud or concealment while plans of reorganization were before the board, should not be converted into stock of the reorganized company, like other preferred stock, but should be surrendered at costs plus interest. The Commission's action was not precluded by the fact that it had not anticipated this problem and adopted a general rule or regulation governing management *Page 291 
trading during reorganization. The court further held that the choice between proceeding by general rule or by ad hoc decisions is one that lies primarily in the informed discretion of the administrative agency, and that an ad hoc decision of the Commission might have a retroactive effect does not necessarily render it invalid. The majority opinion, written by Justice Murphy, was at that time met with bitter criticism. In a dissent by Justice Jackson, concurred in by Justice Frankfurter, it was said, at pages 213, 214:
"The Court's reasoning adds up to this: The Commission must be sustained because of its accumulated experience in solving a problem with which it had never before been confronted!
"Of course, thus to uphold the Commission by professing to find that it has enunicated a `new standard of conduct' brings the Court squarely against the invalidity of retroactive law-making. But the Court does not falter. `That such action might have a retroactive effect was not necessarily fatal to its validity.' (Par. 17.) `But such retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles.' (Par. 17.) Of course, if what these parties did really was condemned by `statutory design' or `legal and equitable principles,' it could be stopped without resort to a new rule and there would be no retroactivity to condone. But if it had been the Court's view that some law already prohibited the purchases, it would hardly have been necessary three sentences earlier to hold that the Commission was not prohibited `from utilizing this particular proceeding for announcing and applying a new standardof conduct.' (Par. 17.) (Emphasis is supplied.)
"I give up. Now I realize fully what Mark Twain meant when he said, `The more you explain it, the more I don't understand it.' "
We find no instance in the law of the state of Ohio supporting the principle of rule making by adjudication as set forth inChenery, supra. To the contrary, we believe *Page 292 
that law should provide like treatment under like circumstances. Furthermore, it would seem that the Supreme Court inFortner v. Thomas (1970), 22 Ohio St.2d 13, has impliedly precluded rule making by adjudication as a necessary corollary to its holding that the review of proceedings of administrative officers and agencies by Section 4 (B), Article IV of the Ohio Constitution contemplates quasi-judicial proceedings only and that courts will not aid in making or revising rules of administrative officers, boards or commissions.
As Justice Douglas once said: "Law has reached its finest moments when it has freed man from the unlimited discretion of some ruler, some civil or military official, some bureaucrat. Where discretion is absolute, man has always suffered." (Dissenting in United States v. Wunderlich (1951), 342 U.S. 98, at 101.)
Another reason for definite standards of administrative adjudication is the social value in encouraging the security of transactions, and for some degree of stability. Persons engaged in business have a right to know what government policy and rules are in advance, rather than the destructive effect created by rule making by adjudication.
The setting forth of rules in advance does not preclude the overruling of a policy when changed conditions or further reflection deem it desirable. But such reversal tends to be more deliberate and public, rather than ill-considered and frequently concealed. Rule making by adopting regulations rather than by adjudication tends to minimize aimless drifting periods when a commission is rendered helpless by incompetence; we hasten to add that there is nothing in the record to indicate any incompetence under the direction of the present Superintendent.
Another reason advanced against adjudicative rule making is the rigidity given decisions when the rule of stare decisis is applied to administrative decisions. Rules are meant to be changed whenever conditions suggest that a change is necessary. To the contrary, adjudications are the result of a law or rule being applied to a fact situation by a tribunal which is usually considered rigid and unchanging. *Page 293 
However, if there be no rule, then the result becomes as flexible as the grass in a breeze. It is important to the democratic process that commissions say what they are doing, and adhere to what they have said unless and until a change is clearly indicated. It is almost axiomatic that absence of definite rules creates a vacuum into which attempts to influence by interested individuals are bound to rush.
Furthermore, even within the boundaries of Chenery, supra, laid down by the majority of the United States Supreme Court, at page 202, 203, we find that the problem facing the Superintendent in this case is not one "which the administrative agency could not reasonably foresee * * *" or that "the agency may not have had sufficient experience with * * * to warrant rigidifying its tentative judgment into a hard and fast rule * * * or the problem * * * so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule."
We find that the standard laid down by an administrative agency must afford a fair degree of predictability and intelligibility of decision, for a disappointing answer to a question is better than no answer at all. Although rule making by adjudication may necessarily be the by-product of adjudication, we reject, as being the law of Ohio, the principle that rule making may be the purpose of adjudication. For the foregoing reasons, the second assignment of error is sustained.
In considering appellant's first assignment of error, we would note the reference of the superintendent to the $13,136,515.02 contingency reserves which he found sufficient to pay about 2.87 months of claims, which level of reserves he found to be unreasonably high.
First, however, the evidence in the record indicates that the $13,136,515.02 reserve includes all classes of subscribers: group, direct pay and bank. Much of the testimony centered around the need for reserves for groups; however, there is no indication of that portion of the reserve apportionable to direct-pay subscribers. There is evidence which indicates that this class of subscribers has *Page 294 
been operating at a loss, which would not indicate excessive allocation to the reserve for direct-pay subscribers.
It must be cautioned that the department must predicate its findings upon evidence in the record, not outside information known to the Superintendent which is not in the record and if there be evidence known, it is essential that it be put into the record before it can be considered
While the Superintendent may in an adjudicatory proceeding, if there be evidence to support such a finding, make a finding that a company has, in effect, hidden income by transferring an amount in excess of that actuarially necessary to reserves, he may not impose a rule as to the period of time which reserves may cover which would involve the rule-making process by adjudication, which we have discussed above.
Second, as to the group contribution factor of .5%, the evidence indicates that this is a mere arbitrary figure which is not actuarially supported.
Third, as to the completion factor, the application indicates that in computing the rates requested, a 5% completion factor was utilized, whereas a 2% completion factor should have been used, resulting in a request for higher rates than could be justified.
The request for a reduction in the requested rates was made upon the assumption that the Department of Insurance has the power to reduce the rate requested in the application. A statement by Mr. Dorrell, the attorney for appellant, reads as follows:
"We are asking rate increases and as I understand it, the Department of Insurance has the power to grant the total or diminish the rate, depending upon the outcome of a public hearing."
We find this to be an incorrect assumption in the light of the language of R. C. 1739.051:
"* * * The superintendent shall, within thirty days after the commencement of a hearing issue an order either approving any such contract, amendment, formula, or rate if he finds it to be lawful, fair, and reasonable, or disapproving any such contract, amendment, formula, or rate if he finds it otherwise. * * *" *Page 295 
We find no statutory power invested in the Superintendent to modify.
Although we find that there is evidence in the record which would require a finding that the appellant is entitled to an increase in rates for direct-pay subscribers, the finding by the Superintendent that the requested rate "is other than lawful, fair, and reasonable" is supported by real, probative and substantial evidence.
Therefore, because the Superintendent of Insurance must either approve or reject the proposed rates, but cannot modify, we must affirm the judgment of the Court of Common Pleas.
Judgment affirmed.
WHITESIDE, J., concurs.