Original
No. 6685

### NEW HAMPSHIRE-VERMONT PHYSICIAN SERVICE

v.

### JOHN A. DURKIN, INSURANCE COMMISSIONER

December 28, 1973

*Sulloway, Hollis, Godfrey & Soden (Mr. James B. Godfrey* orally)
for the plaintiff.

*Warren B. Rudman,* attorney general, and *Edward A. Haffer,*
attorney (*Mr. Haffer* orally), for the defendant.

KENISON, C.J. The major issue in this case is whether the
defendant insurance commissioner's order of May 14, 1973,
in reference to the operation of the Blue Shield plan in New
Hampshire was within his statutory authority under RSA
ch. 420. This order required the plaintiff to decrease its rates
not later than July 1, 1973, by the amount of $718,610, an
annualized decrease of 9 percent. It was accompanied by
supplemental orders requiring the plaintiff among other
things to:
   1. Eliminate existing distinctions in coverage and rates
   between group and nongroup subscribers;
   2. Upgrade insurance contracts offering unrealistically low
   benefits to new subscribers;
   3. Increase the major medical lifetime benefits from

$30,000 to $250,000 per covered claimant and provide a maximum coinsurance payable clause no greater than $1,000 per year per covered claimant without an upward adjustment in the rate level.

Also attached were recommendations urging the plaintiff in part to:

a. Accomplish the merger of Blue Cross and Blue Shield as soon as possible, but not later than December 31, 1973, and reconstitute the membership of their boards so that a majority comes from the nonprofessional working men and women of the State who compose the majority of their subscribers;

b. Submit proposals to underwrite enlarged psychiatric benefits;

c. Explore the possibility of providing adequate student accident coverage to all school children in the respective States.

An original petition for a writ of certiorari was filed by the plaintiff challenging the legality of the defendant's orders and recommendations, and this court, by order dated June 22, 1973, granted the plaintiff's motion to suspend the rate decrease under bond, pending a determination of its legality. *New Hampshire-Vermont Physician Serv. v. Durkin,* 113 N.H. 295, 306 A.2d 62 (1973).

The history of the present case is closely tied to RSA 420:6. This statute provides that a nonprofit medical service corporation, such as Blue Shield, is prohibited from "[entering] into any contract with subscribers unless and until it shall have filed with the insurance commissioner of the state a full schedule of rates to be paid by the subscribers and shall have obtained the said commissioner's approval. The commissioner may refuse such approval if he finds such rates are excessive, inadequate or discriminatory."

In accordance with these provisions, the plaintiff filed for a 25% increase in its Blue Shield rate schedule on July 19, 1971. After a series of hearings and several modifications of the proposed rate schedule, the defendant commissioner approved on July 27, 1972, an annualized increase of 4.5% in Blue Shield's total revenue for 1972. The modifications were made necessary as a result of a dispute between the

plaintiff and the defendant commissioner over the appropriate size of Blue Shield's "contingency reserve." This reserve functions to protect the plaintiff from a condition of temporary insolvency which could result from unusually large claims arising from a catastrophe or epidemic. The plaintiff's actuary, who serves as a consultant for a number of Blue Shield plans in other States, recommended a rate schedule which would maintain the contingency reserve at a level of two months of claims and administrative expenses in 1972, a sum equal to approximately $3,200,000. However, two actuaries on the staff of the New Hampshire Insurance Department and an independent actuary hired by the commissioner took the position that one month of claims and expenses, $1,600,000, would be adequate. In the course of negotiation, the plaintiff agreed to maintain a one month reserve on a trial basis and accordingly revised its request to the 4.5% rate increase. The commissioner approved this rate increase with the following qualification: "I find that a surplus equivalent to one month's operating costs is adequate for [Blue Shield] under the circumstances of the present filing . . . . [L]esser amounts may be adequate in the reasonably near future, especially with the advent of prospective rating and the annual review of rates and experience to be conducted in December or no later than the first two weeks of January."

On December 6, 1972, Blue Shield filed with the department experience data and projections for 1973. Although the projections indicated that the contingency reserve would drop below the one-month level during the year, Blue Shield informed the defendant commissioner by letter on December 14, 1972 that it would not apply at that time for an increase in rates, but it reserved the right for such an application at any time during 1973 if its reserve eroded as expected. On December 27, 1972, however, the department initiated over the objection of the plaintiff a series of public hearings which examined in part the effect of a continuation of Blue Shield's existing rates in 1973 and culminated in the May 14, 1973 order.

The scope of judicial review under a writ of certiorari, *see* RSA 490:4 (Supp. 1972), is restricted to a determination

of whether an administrative body has acted illegally in respect to jurisdiction, authority or observance of law. *State v. Salvucci, Inc.,* 110 N.H. 502, 504, 272 A.2d 854, 855 (1970). Certiorari is not available to review issues of fact, except in regard to the question of law as to whether an agency's findings could have been reasonably made. *See Quinn v. Concord,* 108 N.H. 242, 245, 233 A.2d 106, 108 (1967); *Sinkevich v. Nashua,* 97 N.H. 262, 264, 86 A.2d 562, 563 (1952).

The plaintiff's principal contention challenges the legality of the defendant commissioner's order to Blue Shield to reduce its existing rates by an annualized decrease of 9%. The plaintiff essentially argues that the commissioner is only authorized under RSA 420:6 to disapprove rates if he finds them excessive, inadequate or discriminatory and has no power to prescribe lower rates. The defendant commissioner asserts in response that the legislature did not so intend to restrict the commissioner's authority and finds an implied grant of power in RSA 420:6 which would permit the commissioner to establish and endorse rate levels within the standards set forth in the statute.

The commissioner's basic authority in supervising the affairs of insurance companies in New Hampshire is defined in RSA ch. 400-A (Supp. 1972). RSA 400-A:15 I (Supp. 1972) is particularly relevant to this case and states that "The commissioner shall have full power and authority to make, promulgate, amend and rescind reasonable rules and regulations for, or as an aid to, the administration or effectuation of *any provision or provisions of this title* and such other rules and regulations as are reasonably necessary to implement the *provisions of this title*" (emphasis added). When this provision is read in conjunction with the provisions of RSA ch. 420, it is apparent that the legislature vested discretionary power in the commissioner to regulate certain aspects of medical service corporations. *See Associated Hosp. Serv. v. Mahoney,* 161 Me. 391, 400-02, 213 A.2d 712, 718 (1965); 2 G. Couch, Insurance §21:5 (2d ed. R. Anderson 1959, Supp. 1972).

One such aspect deals with rates charged by the corporations for their services. RSA 420:6 not only grants authority to approve or disapprove rates under the "excessive, inadequate or discriminatory" standard, but it also permits

him to employ an actuary to assist in the determination of "proper" rate levels. In facilitating the administration of these provisions, we believe that the commissioner is acting within his authority in issuing regulations which define the criteria that the medical service corporations must satisfy before their rates will comply with the standards set forth by the statute. *See Hospital Serv. Corp. v. West,* 308 A.2d 489, 495-96 (R.I. 1973); *Thaler v. Stern,* 253 N.Y.S.2d 622, 630-34, 44 Misc. 2d 278 (1964); *Massachusetts Medical Serv. v. Commissioner,* 344 Mass. 335, 339-41, 182 N.E.2d 298, 301-02 (1962). *See also* 2 G. Couch, Insurance §21:14 (2d ed. R. Anderson 1959, Supp. 1972); Brown, *Rule Making by Adjudication in Rate-Making Proceedings – Some Notes on the Regulation of Blue Cross,* 604 Ins. L.J. 264 (1973); MacIntyre, *Thirty Years of Blue Cross and Blue Shield,* J. Am. Soc'y (C.L.U.) 189 (1964).

In the present case, the defendant commissioner's order of May 14, 1973, established the departmental rule that a contingency reserve fund equivalent to ten days of claims and expenses was adequate to protect a medical service corporation's financial stability. In accordance with this rule, he determined that any rate schedule which maintained the fund in excess of this amount was per se excessive and thus ordered Blue Shield to reduce the fund by $405,382 through the means of an annualized rate decrease of 2.5%. The defendant also found that departmental adjustments in the valuation of assets and liabilities and anticipated improvements in and corrections to projected operations would amount to the equivalent of an annualized rate decrease of 6.5%. Since these rate decreases were merely mechanical adjustments to ensure compliance with the rules of the department, we hold that the commissioner was acting within his authority under RSA 420:6.

The commissioner notified all interested parties by letter on December 20, 1972, that he intended to review matters affecting rate levels and afforded them an opportunity to be heard pursuant to RSA 400-A:15 II (Supp. 1972). *Cf. Pittsburgh v. Blue Cross,* 4 Pa. Cmwlth. 262, 286 A.2d 475 (1971). The fact that he proceeded in an adjudicatory rather than rule-making context is irrelevant to the validity of the order in that the Supreme Court has endorsed an agency's

choice of the former ad hoc approach under circumstances where it "may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule." *SEC v. Chenery Corp.,* 332 U.S. 194, 202, 91 L. Ed. 1995, 67 S. Ct. 1575 (1947); 1 F. Cooper, State Administrative Law 181-83 (1965); Shapiro, *Rule Making as Adjudication,* 78 Harv. L. Rev. 921, 926-29 (1965). In this case the commissioner reduced the size of the contingency fund in degrees in order to gather experience data as to the effect of the reduction on the financial condition of Blue Shield. The decision to proceed in this ad hoc fashion lies within his administrative discretion. *SEC v. Chenery Corp. supra;* 1 F. Cooper, State Administrative Law 180-81 (1965).

We reject the plaintiff's contention that the defendant commissioner was without authority under RSA 420:6 to order a rate reduction since Blue Shield did not make any rate filing for 1973 nor seek approval for the continuation of the 1972 rates. The defendant commissioner's order of July 27, 1973, indicated that his approval of the rate schedule was tentative, pending an evaluation of effect of the new rates. Since the commissioner has the duty to ensure that such rates are not "excessive, inadequate or discriminatory," his responsibilities in this area would be unnecessarily restricted if we adopted a construction of RSA 420:6 which relegated him to a passive role. Changing circumstances could affect a rate schedule to the detriment of the subscribers, and the intention of the legislature to vest supervisory powers in the commissioner to ensure fair rates would be subverted if he were permitted to act only when a medical service corporation filed a new rate schedule. *See Thales v. Stern,* 253 N.Y.S.2d 622, 633, 44 Misc. 2d 278 (1964); *cf. New Jersey State AFL-CIO v. Bryant,* 55 N.J. 171, 176, 260 A.2d 225, 227 (1969).

We do agree, however, with the plaintiff's contention that the record cannot reasonably support a finding that a ten-day reserve is adequate to the extent that insufficient evidence was presented in the hearings to sustain the defendant's finding. *See* G. Couch, Insurance §21:38 (2d ed. R. Anderson 1959, Supp. 1972). The May 14, 1973 order indicates that he relied on the testimony of an actuary of the insurance

department, who apparently made a study of the historical data and statistical fluctuations of Blue Shield and took account of changes in the administration of the corporation. In reviewing the May 14, 1973 order and the testimony of the actuary, we are unable to discover any facts other than conclusory opinions to support the position that the ten-day reserve would be adequate. *See New England Tel. & Tel. Co. v. State,* 95 N.H. 353, 359, 64 A.2d 9, 15 (1949); 1 F. Cooper, State Administrative Law 259-62 (1965); K. Davis, Administrative Law Text §29.02 (3d ed. 1972). This failure is particularly disturbing in light of evidence introduced by the plaintiff indicating the great majority of other medical service plans have considerably higher reserve levels. *See* R. Eilers, Regulation of Blue Shield and Blue Cross Plans 230-59 (1963); *cf. Boston & Me. R.R. v. State,* 102 N.H. 9, 11, 148 A.2d 652, 653 (1959). Although it is apparent that the defendant commissioner was vigorously attempting to protect the interest of the subscribers in reducing rates to reasonable levels, he should proceed in accordance with established principles of administrative law. His regulations and orders should be grounded on competent and substantial evidence and clearly reveal the basis of his determinations. *Application of Blue Cross,* 34 Ohio Misc. 29, 296 N.E.2d 305, 307-09 (Ct. Com. Pls. 1972); *Liberty Mut. Ins. Co. v. Larson,* 169 So.2d 866, 872 (Fla. D.C. App. 1964); *see* RSA 400-A:14 I, 23 II A (Supp. 1972).

The plaintiff has also objected to the May 14, 1973 supplemental orders 1, 2 and 3 as being illegal and issued without authority. We are not persuaded by the plaintiff's arguments relating to the commissioner's authority in that he has general authority under RSA 420:3 (Supp. 1972) to license those corporations which have demonstrated that they are "safe, reliable and entitled to public confidence." *See* Heitler, *What the Practicing Lawyer Should Know about Blue Cross and Blue Shield,* ABA Sect. Ins. N.& C.L. 363, 364-65 (1968). Under these provisions it would appear that a necessary concomitant to the commissioner's authority to find rates "inadequate or discriminatory" would be the ability to establish the minimum level of services offered by the corporations for the protection of subscribers. *Associated Hosp. Serv. v. Mahoney,* 161 Me. 391,

400-02, 213 A.2d 712, 718 (1965). Otherwise, the public confidence in such corporations could be undermined if they failed to provide adequate coverage, especially since as non-profit institutions, they exist solely for the benefit of the subscribers. Brown, *Rule Making by Adjudication in Rate-Making Proceedings – Some Notes on the Regulation of Blue Cross*, 604 Ins. L.J. 264, 268-69 (1973). However, we agree with the plaintiff that the supplemental orders 1, 2 and 3 are defective for the same reasons that the order for a ten-day reserve failed, namely that the commissioner has neglected to specify the facts underlying the orders and the record itself does not disclose any evidence other than vague unsubstantiated remarks in their support.

We do not find it necessary to review the May 14, 1973 recommendations a, b and c in view of the fact that they have no legal effect and merely represent the precatory concerns of the department. *See* K. Davis, Administrative Law Text §21.04 (3d ed. 1972).

*Remanded.*

DUNCAN, J., did not sit; the others concurred.