# Consumer Credit Insurance Association v. State of Vermont; Department of Banking and Insurance; Thomas Menson, Commissioner; Vermont Automotive Association, Intervenor

[544 A.2d 1159]

No. 86-317

Present: Allen, C.J., Peck, Gibson, Dooley and Mahady, JJ.

Opinion Filed February 12, 1988

*Peter H. Zamore* of *Sheehey Brue Gray & Furlong*, Burlington, and *Timothy L. Tucker*, Chicago, Illinois, for Plaintiff-Appellee.

*Jeffrey L. Amestoy*, Attorney General, and *William E. Griffin*, Chief Assistant Attorney General, Montpelier, for Defendants-Appellants.

**Mahady, J.** The plaintiff, Consumer Credit Insurance Association (Association), brought this action to enjoin an insurance regulation promulgated by the Department of Banking and Insurance (the agency). The trial court held that the agency lacked statutory authority to promulgate the regulation and granted the injunction.

The principal issue presented by the agency's appeal is whether the regulation was authorized by statute. We conclude that it was and reverse, except as to § 12(3) of the regulation which we hold does exceed the statutory authority of the agency.

The regulation at issue relates specifically to credit insurance which is sold in connection with loans. Such insurance provides for the repayment of loans in the event the debtor dies or becomes disabled. The Association challenged three particular provisions of the regulation.

The first provision at issue limits credit life insurance to the "total amount payable" which is defined to mean "the total outstanding amount owed by the debtor at the time of the death insured against, excluding any unearned interest or finance charges." Regulation I-84-1 (Revised), § 3(10)(a) and § 2(7). The regulation allows additional coverage in the amount of "two monthly payments" in all cases, and possible coverage beyond that in special situations. Regulation I-84-1 (Revised), § 3(10)(a)(ii).

The second provision challenged by the Association concerns the rates charged for credit life and disability insurance. By statute, the Commissioner of Banking and Insurance is required to disapprove any form of insurance policies "if the benefits provided therein are not reasonable in relation to the premium charge." 8 V.S.A. § 4108(b). The regulation provides that benefits will be deemed "reasonable in relation to the premium" if the premium rate yields "a loss ratio of not less than 60% for credit life insurance and not less than 70% for credit accident and health insurance." Regulation I-84-1 (Revised), § 5(1).

The third provision provides that it is an unfair trade practice for an insurer to give creditors who sell credit insurance on their behalf special advantages not set out in the insurance contract, or to compensate creditors or banks through the mechanism of interest-free accounts. Regulation I-84-1 (Revised), § 12.

## I.

Under current practices in the credit insurance industry, the borrower typically purchases insurance in an amount in excess of the amount actually necessary to repay the loan. By way of example, the trial court found that a person who borrows $10,000 for 15 years at 13% will be sold a credit life insurance policy with an initial value of $25,192.00, paying a premium of $1,336.00. This is known as "gross coverage." A similar policy with an initial $10,000 value carries a premium of $638.00. This is known as "net coverage." It is this practice, providing gross coverage rather than net coverage, which § 3(10)(a) of the regulation seeks to curtail.

The Vermont Credit Life Insurance Act, 8 V.S.A. §§ 4101-4115, was adopted in 1959. It provides that "[t]he amount of credit life insurance shall not exceed the initial indebtedness." 8 V.S.A. § 4105(a). The Commissioner is authorized to "issue such rules and regulations as he deems appropriate for the supervision" of the Act. 8 V.S.A. § 4113.

Nevertheless, no rule or regulation concerning the amount of coverage was ever promulgated under the Act prior to July, 1986, when the section under consideration was adopted. Meanwhile, the Commissioner has approved policies which extend gross coverage. The Association claims that the Commissioner has thereby effectively interpreted the statute to permit gross coverage for a period of twenty-six years. The Association therefore argues that the customary deference accorded to the statutory construction of a regulatory agency, see, e.g., *In re Village of Hardwick Electric Department*, 143 Vt. 437, 444, 466 A.2d 1180, 1183 (1983), is not appropriate where the agency reverses itself for no reason other than a new interpretation of the same statute.

The Association's argument, however, does not accurately state the position of the agency. Cogent reasons for the promulgation of § 3(10)(a) have been advanced by the agency.

Subsequent to the enactment of the Credit Life Insurance Act, the Vermont Legislature adopted a statute which provided that

"[i]nterest shall not be paid, deducted or added to principal in advance." 9 V.S.A. § 41a(d)(1). This effectively diminished the need for gross coverage credit insurance. The agency also points to the fact of increased rates and longer terms since the adoption of the Credit Life Insurance Act. These historical trends have led to greater differences in the cost to the borrower of gross coverage when compared to the cost of net coverage.

These are matters within the special expertise of the agency. "Absent a clear and convincing showing to the contrary, decisions made within the expertise of [administrative] agencies are presumed [to be] correct, valid and reasonable." *In re Johnston*, 145 Vt. 318, 322, 488 A.2d 750, 752 (1985) (citing *State of Vermont Department of Taxes* v. *Tri-State Industrial Laundries, Inc.*, 138 Vt. 292, 294, 415 A.2d 216, 218 (1980)). No such clear and convincing showing has been made here.

■ As to the previous position of the agency, administrative agencies "are free to bind themselves by a strong doctrine of stare decisis and they are free to depart rather freely from their precedents." K. Davis, Administrative Law Text § 17.07, at 352 (3d ed. 1972). Therefore, "[w]hen . . . an agency decides that law it has previously declared is unsound and ought not to be followed, neither estoppel nor stare decisis nor any other doctrine should prevent it from creating new law and applying it prospectively." *Id.* This is especially the case where the agency supplies "a reasoned analysis for the change." *Motor Vehicle Manufacturers Association* v. *State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 42 (1983). Here, the agency has determined that it is appropriate to abandon its previous interpretation of the statute, supplying a reasoned analysis for the change within the area of its special expertise.

■ The agency has ample statutory authority to "issue such rules and regulations as [it] deems appropriate for the supervision," 8 V.S.A. § 4113, of the legislative mandate that "[t]he amount of credit life insurance shall not exceed the initial indebtedness." 8 V.S.A. § 4105(a); see also 8 V.S.A. § 75. Under these circumstances, it is not appropriate for the judiciary to interfere with the executive agency to which the Legislature has entrusted the responsibility in the first instance. Vt. Const., ch. II, § 5; see *In re H. A. Manosh Corp.*, 147 Vt. 367, 370, 518 A.2d 18, 20 (1986); *In re G. F.*, 142 Vt. 273, 281, 455 A.2d 805, 809 (1982); *In*

*re Agency of Administration,* 141 Vt. 68, 74-75, 444 A.2d 1349, 1351-52 (1982).

## II.

The Legislature has directed the Commissioner of Banking and Insurance to disapprove any form of credit insurance policies "if the benefits provided therein are not reasonable in relation to the premium charge." 8 V.S.A. § 4108(b). Section 5(1) of the regulation seeks to set a standard for the application of that mandate by providing that benefits will be deemed "reasonable in relation to the premium" if the premium rate yields "a loss ratio of not less than 60% for credit life insurance and not less than 70% for credit accident and health insurance."

The Association contends that the statute, 8 V.S.A. § 4108, creates a regulatory framework within which the Commissioner must play an essentially passive role, approving or disapproving insurance forms submitted to him by insurers. It is the Association's position that § 5(1) in effect disapproves certain forms in advance, an active role which exceeds the Commissioner's purely passive statutory authority.

However, § 5(1) does not override the statutory framework of § 4108. An insurer still must submit a proposed form to the Commissioner, who may disapprove the form. 8 V.S.A. § 4108(a). If the form is not approved, notice must be given to the insurer, who has the right to challenge the disapproval at a hearing. 8 V.S.A. § 4108(b)-(d). The final determination of the Commissioner is subject to judicial review. 8 V.S.A. § 4108(f). Section 5(1) merely provides a standard which the Commissioner intends to apply in § 4108 proceedings.

The Association's position nevertheless finds support in our previous decision, *New Hampshire-Vermont Physician Service v. Commissioner, Department of Banking & Insurance,* 132 Vt. 592, 326 A.2d 163 (1974), a Blue Cross-Blue Shield rate setting case. There we held that "[w]e have found nothing either in the statutes or our case law which can reasonably be construed as expanding the passive power of approval and disapproval defined" in 8 V.S.A. § 4584. *Id.* at 596, 326 A.2d at 166. We further held that "[a] public administrative authority has only such powers as are expressly granted by the Legislature, together with those implied as necessary for the full exercise of those granted." *Id.* In

that case, the Commissioner had issued regulations which defined the criteria that an applicant would be expected to satisfy before its rates would comply with the statutory standards. This Court disallowed that action as exceeding the Commissioner's "limited authority to 'examine proposed contracts with the right to refuse a permit for their use if he finds the rates therein to be excessive, inadequate, or unfairly discriminatory.'" *Id.* at 596, 326 A.2d at 165-66 (quoting *In re New Hampshire-Vermont Hospitalization Service*, 132 Vt. 66, 69, 313 A.2d 6, 7 (1973)).

The hearings which preceded the issuance of the order which was the subject of that appeal were conducted before both the Vermont and New Hampshire Commissioners of Banking and Insurance. The New Hampshire Commissioner issued an order identical to that of the Vermont Commissioner. The New Hampshire Supreme Court held that the New Hampshire Commissioner had acted within his authority. *New Hampshire-Vermont Physician Service* v. *Durkin*, 113 N.H. 717, 722, 313 A.2d 416, 420-21 (1973); see also *New Hampshire-Vermont Hospitalization Service* v. *Whaland*, 114 N.H. 92, 97, 315 A.2d 191, 194 (1974).

In our Blue Cross-Blue Shield decision, we attempted to distinguish the *Durkin* holding on the basis that the "authority granted to the Vermont Commissioner [had] a considerably narrower statutory basis." *New Hampshire-Vermont Physician Service*, 132 Vt. at 595, 326 A.2d at 165. In particular, we took note of the New Hampshire statute which authorized the New Hampshire Commissioner to make rules and regulations "'for, or as an aid to, the administration or effectuation of any provision or provisions of this title, and such other rules and regulations as are reasonably necessary to implement the provisions of this title.'" *Id.* (quoting N.H.R.S.A. 400-A: 15 I (Supp. 1972)).

At that time we failed to take any note whatsoever of our own comparable statute which provided, and still provides, that "[i]n addition to other powers conferred by this title the commissioner may promulgate such rules as shall be authorized by this title and such additional rules as shall be necessary or desirable to carry out the purposes of this title . . . ." 8 V.S.A. § 75. We also noted the authority of the New Hampshire Commissioner to employ an actuary, N.H.R.S.A. 420:6, as well as his authority to license hospital and medical service corporations. N.H.R.S.A. 420:3 (Supp. 1972); *New Hampshire-Vermont Physician Service*, 132 Vt. at

595, 326 A.2d at 165. Any controlling significance of these two statutes is not now readily apparent.

While we asserted that "[t]he New Hampshire court placed special reliance on these broad provisions," *id.*, a careful reading of Chief Justice Kenison's well-reasoned opinion indicates that the New Hampshire court was relying on the weight of authority in other jurisdictions and policy considerations. *Durkin*, 113 N.H. at 722, 313 A.2d at 420.

More helpful than our previous Blue Cross-Blue Shield decision is the discussion of Judge Fuld in *Old Republic Life Insurance Co.* v. *Wikler*, 9 N.Y.2d 524, 175 N.E.2d 147, 215 N.Y.S.2d 481 (1961). The New York statutes authorize the New York Superintendent of Insurance to disapprove credit life insurance rates which are "unreasonable in relation to the benefits provided" and to prescribe regulations for determining procedures and terms applicable to credit insurance policies. The Superintendent promulgated a regulation which set forth premium rates, referred to as "standards," which "will be considered adequate and not unreasonable in relation to the benefits provided." The New York court held this promulgation by the Superintendent to be "well within his statutory powers." *Id.* at 529-30, 175 N.E.2d at 149, 215 N.Y.S.2d at 484. The court noted that "[i]n point of fact, a standard announced in advance is often in aid of sound administration and the fair exercise of public power." *Id.* at 531, 175 N.E.2d at 150, 215 N.Y.S.2d at 485.

In *Old Republic*, the plaintiff argued, as does the Association here, that the regulation shifted the burden of proof with respect to reasonableness of rates from the agency to the insurer. The New York court, however, concluded:

> The point does not impress us. The fact is that, with or without the regulation, the insurer must establish by ordinary principles of administrative law that its filing should be approved, in other words, that such filing meets the statutory standards. . . .
>
> In short, whether an insurer files its rates for approval or seeks to prove that the statutory conditions have been met, the requirement for obtaining such approval is the same. The premium rates must be not "unreasonable in relation to the benefits provided."

*Id.* at 531-32, 175 N.E.2d at 150, 215 N.Y.S.2d at 485-86.

Relying upon *Old Republic,* the Supreme Court of Virginia has reached similar conclusions. *American Bankers Life Assurance Co. v. Division of Consumer Counsel,* 220 Va. 773, 778-81, 263 S.E.2d 867, 870-71 (1980).

We, too, find the analysis of the New York court to be persuasive. Accordingly, we hold that the Commissioner did not exceed his statutory authority when he promulgated § 5(1).

## III.

A current practice in the credit insurance industry provides banks which sell such insurance with an indirect compensation. Under this practice, a bank which sells credit insurance is allowed by the insurer to retain the premiums in noninterest bearing accounts for periods of time as long as one year. The effect is the payment of a hidden commission to the bank by the insurer.

The Commissioner in promulgating § 12 of the regulation seeks to prohibit the granting of "any special advantage or any service not set out in . . . [the] insurance contract." Regulation I-84-1 (Revised) § 12(1). He further seeks to make it an unfair trade practice for insurers to make deposits of money "without interest or at a lesser rate of interest than is currently being paid by the creditor, bank or financial institution to other depositors of like accounts." Regulation I-84-1 (Revised), § 12(3).

The trial court concluded that the agency has no authority for designating the practice of no-interest deposits as an unfair trade practice. The trial court found that the unfair trade practices detailed by the Legislature at 8 V.S.A. § 4724 are exclusive, that the practice designated by Regulation I-84-1 (Revised) does not fall within the practices defined in § 4724, and therefore the agency exceeded its authority in designating this practice as being "unfair."

A careful review of § 4724, which defines what methods of competition or deceptive acts or practices are unfair in the insurance business, reveals little language that covers commissions from the insurer to a creditor or broker. Section 4724(8)(A) on rebates and inducements is cited by the agency as expressly prohibiting the practice of no-interest accounts. We do not interpret that provision to have this meaning. The section refers to agreements between the insurer and the insured, not between the broker or creditor and the insurer. Therefore, the trial court was

correct when it found that the agency went beyond its authority when it designated the practice of no-interest accounts as an unfair trade practice. The practice it seeks to prohibit under § 12(3) is not proscribed by statute, and the rule cannot stand.

■ Subsection (1) of § 12 of the rule which the agency promulgated to assure full financial disclosure in the marketing of credit insurance, however, does fall within the practices delineated under § 4724. Brokers and agents of insurance companies are required to put their fee arrangements into written agreements. 8 V.S.A. § 4724(14). However, the statute exempts from this requirement "[c]ommissions, expense allowances, bonuses, fees, or any other compensation received *directly* by agents or brokers from any legal entity engaged in the insurance business . . . ." *Id.* (emphasis added). Because the benefit received from noninterest bearing accounts is an indirect benefit, it is not subject to the statutory exemption. Arguably, a hidden commission such as a noninterest bearing account does not involve costs directly affecting the consumer; however, because this form of commission is done indirectly and is not disclosed to the public, it is violative of § 4724(14). As such, § 12(1) of the rules promulgated by the agency implements the unfair trade practices provisions of § 4724. Therefore, the agency did not exceed its authority as provided by 8 V.S.A. § 75.

*Reversed. The injunction is dissolved as to Regulation I-84-1 except as it relates to subsection 3 of § 12 of the regulation.*