NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 64

No. 2018-358

| | |
|---|---|
| In re Petition of Apple Hill Solar LLC (Libby Harris and Apple Hill Homeowners Association, Appellants) | Supreme Court |
| | On Appeal from Public Utility Commission |
| | May Term, 2019 |

Anthony Z. Roisman, Chair

L. Brooke Dingledine of Valsangiacomo, Detora & McQuesten, P.C., Barre, for Appellants.

Kimberly K. Hayden of Paul Frank + Collins P.C., Burlington, and Thomas Melone of Allco Renewable Energy Limited, New York, New York, for Appellee.

Thomas J. Donovan, Jr., Attorney General, and Benjamin D. Battles, Solicitor General, Montpelier, for Appellee Agency of Natural Resources.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1. **ROBINSON, J**. Neighbors of a proposed solar electric-generation facility appeal a decision of the Public Utility Commission (PUC) approving the issuance of a certificate of public good for the project. At the heart of their appeal is a challenge to the PUC's conclusions that this project—called the Apple Hill project—would not unduly interfere with the orderly development of the region and would not have an undue adverse effect on aesthetics. Both of these conclusions rest in substantial part on the PUC's conclusions that the selectboard of the Town of Bennington took the position that the Apple Hill project complied with the applicable Town Plan, and that the

2010 Town Plan did not establish a clear, written standard. Because the evidence and the PUC's findings do not support these conclusions, we reverse and remand.

¶ 2. The following background is undisputed. In 2015, appellee Apple Hill Solar LLC filed a petition with the PUC requesting a certificate of public good (CPG) for a proposed 2.0 megawatt, grid-connected solar-electric generation facility in Bennington.

¶ 3. The project site is in the southwest corner of a Rural Conservation District as defined in the Bennington Town Plan. According to the Town Plan, Rural Conservation Districts are characterized by considerable agricultural acreage, along with extensive woodlands and low-density residential development. The purpose of Rural Conservation Districts is to preserve the open space and distinctive rural character of the area while accommodating low-density residential development in a way that avoids the need for public water-supply and sewer systems. The Town Plan includes specific design standards for the Rural Conservation Districts, stating, "Development in this area cannot be sited in prominently visible locations on hillsides or ridgelines, shall utilize earth tone colors and non-reflective materials on exterior surfaces of all structures, and must minimize clearing of natural vegetation."

¶ 4. Appellants Libby Harris and the members of the Apple Hill Homeowners Association (which includes Harris) live near the proposed project site. Both Harris and the Homeowners Association applied for, and were granted, permissive intervention in the CPG proceeding.

¶ 5. The Town of Bennington also intervened in the proceedings. When it intervened in 2015, the Town argued that the project should not be granted a CPG because it would unduly interfere with the orderly development of the region and would have an undue adverse impact on aesthetics, and in particular, would "violate[] the clear, written community standards in the Town

2

Plan . . . to protect the high scenic quality of this gateway area located in the Rural Conservation District."

¶ 6.    In August 2017, after Apple Hill agreed to various changes to mitigate the aesthetic impact of the project, the Town selectboard changed its position, voting to "not oppose Apple Hill on the grounds that the Project fails to comply with the Town Plan in effect when the application was filed."

¶ 7.    CPG proceedings for another proposed solar-electric generation facility, called the Chelsea Solar project, which would be located next to the Apple Hill project in the Rural Conservation District, are relevant to this appeal.  In February 2016, the PUC held that the Chelsea Solar project would violate clear, written community standards in the 2010 Bennington Town Plan. In re Chelsea Solar LLC, No. 8302, 2016 WL 722444, at *39 (Vt. Pub. Serv. Bd. Feb. 16, 2016).[1] Specifically, the PUC held that the Chelsea Solar project would violate the following three requirements in the Town Plan for development in the Rural Conservation District: only limited residential development is permitted; development may not be sited on prominently visible locations on hillsides; and development must minimize the clearing of natural vegetation.[2]  Id. at *39-40.  Accordingly, it held that the Chelsea Solar project would have an undue adverse effect on aesthetics and denied the petition for a CPG for the project.  Id. at *43.  Chelsea Solar appealed that decision to this Court in June 2017.

¶ 8.    In September 2017, Chelsea Solar filed a motion with the PUC for relief from the February 2016 order in the Chelsea Solar case, in support of which it attached a revised proposal for the project.  The PUC denied Chelsea Solar's motion, but added that it "encourages Chelsea to

---

[1]  The PUC was called the Public Service Board before 2017.

[2]  The Commission noted there was evidence the project would conform to the requirement that development in the Rural Conservation District use earth-tone colors and nonreflective materials.

file a new petition reflecting its proposed . . . project and proposes measures to achieve its prompt review." It said that

> we appreciate Chelsea's efforts to revise the Chelsea Project and its desire to exercise common sense in response to the Town Selectboard's vote to support the revised Apple Hill project. To this end and to promote judicial efficiency, the Commission encourages Chelsea to withdraw its appeal with the Vermont Supreme Court and file a new petition . . . .

Chelsea Solar accordingly withdrew its appeal and filed a new petition for a smaller project with more efficient solar panels in approximately the same location as previously proposed.

¶ 9.     Subsequently, in this Apple Hill matter, the hearing officer issued a proposal for decision finding in pertinent part that the project would not unduly interfere with the orderly development of the region, as required under 30 V.S.A. § 248(b)(1), and would not have an undue adverse effect on aesthetics or on the scenic or natural beauty of the area, as required by 30 V.S.A. § 248(b)(5). Of particular relevance to this appeal, the hearing officer recommended that the PUC conclude that the project would not violate any clear, written community standard—a key consideration in the assessment of whether an adverse aesthetic effect is undue pursuant to § 248(b)(5). He said that neither stare decisis nor collateral estoppel precluded the PUC from deciding here—unlike in Chelsea Solar—that the Bennington Town Plan was not a clear, written community standard.

¶ 10.     The Town withdrew from the Apple Hill proceeding between the time when the hearing officer issued his proposal for decision and when the PUC issued its decision.

¶ 11.     Harris and the Homeowners Association submitted comments on the proposal for decision. They argued that the project would unduly interfere with the orderly development of the region, that the Town Plan contained a clear, written community standard, and that the proposed Apple Hill project would violate the Town Plan for the same reasons the previously rejected Chelsea Solar project would have violated it.

4

¶ 12. The PUC largely adopted the hearing officer's findings and conclusions and issued Apple Hill a CPG.

¶ 13. On appeal, Harris and the Homeowners Association (collectively "appellants") argue, based on the PUC's holding in its Chelsea Solar decision, that collateral estoppel and established precedent preclude the PUC from concluding in this case that the proposed solar project would not violate a clear, written community standard reflected in the Bennington Town Plan. They also argue that the PUC erred in holding that the Apple Hill project would not unduly interfere with orderly development or have an undue adverse effect on aesthetics, and that findings it made in support of these determinations were clearly erroneous. Apple Hill contends that appellants do not have statutory or constitutional standing to appeal the PUC's decision, and that the PUC's order was correct and should be affirmed.

¶ 14. We conclude that appellants have statutory and constitutional standing to appeal. We reject the arguments that collateral estoppel or established precedent prevent the PUC from reaching a different conclusion from its Chelsea Solar decision as to whether the proposed solar project violates a clear, written community standard in the 2010 Bennington Town Plan. Finally, we hold that the PUC's legal conclusions as to whether the Apple Hill project would unduly interfere with the orderly development of the region under § 248(b)(1) or have an undue adverse effect on aesthetics under § 248(b)(5) are not supported by the evidence and the PUC's findings.

I. Standing

¶ 15. In May 2015, Libby Harris filed a motion for permissive intervention.[3] She cited her status as a nearby landowner and emphasized the impacts of the proposed project on her

_____

[3] The PUC Rule governing permissive intervention in PUC proceedings provides as follows:

> Upon timely application, a person may, in the discretion of the Commission, be permitted to intervene in any proceeding when the applicant demonstrates a substantial interest which may be affected

5

property—in particular an increase in fierce winds resulting from the loss of trees that buffer her property, increase in noise from the nearby highway as a result of losing the trees, and an increase in noise from the increased winds. She also noted her membership in the Homeowners Association. Over Apple Hill's objection, the PUC granted permissive intervention to Harris in July 2015. The PUC concluded that, although her petition to intervene emphasized her private concerns, whereas the CPG analysis turns on public impacts, Harris's private concerns "may serve to provide evidence in this proceeding relevant to the public good concerns of certain Act 248 review criteria." The PUC limited the scope of Harris's evidence and arguments to specified criteria.

¶ 16. In December 2017, after Apple Hill modified the project, the Homeowners Association filed a petition to intervene. The petition recited that the Homeowners Association is a neighborhood association of individual property owners who also own common land. They noted potential for increases in traffic noise, wind damage, and air pollution to Homeowners Association members' homes resulting from cutting the forest between the highway and their homes to accommodate the project. They further noted that their members have hiked, recreated in, and enjoyed the forest proposed to be cut, and asserted that the project might affect their groundwater. The PUC granted the motion with some restrictions on the scope of the Homeowners Association's intervention. It noted that the Homeowners Association's members' properties

---

by the outcome of the proceeding. In exercising its discretion in this paragraph, the Commission shall consider (1) whether the applicant's interest will be adequately protected by other parties; (2) whether alternative means exist by which the applicant's interest can be protected; and (3) whether intervention will unduly delay the proceeding or prejudice the interests of existing parties or of the public.

Rules of Practice § 2.209(B), Code of Vt. Rules 30 000 2000 [hereinafter PUC Rule 2.209(B)], https://puc.vermont.gov/sites/psbnew/files/doc_library/Commission%20Rule %202.200%20%289-15-18%29%20Adopted%20CLEAN.pdf [https://perma.cc/8AAJ-3LN8].

6

collectively adjoin the Apple Hill project site, but emphasized that the arguments should focus on whether the proposed project advances the public interest and not on its impacts on individual property rights.

¶ 17.    Apple Hill does not contest the PUC's grant of permissive intervention to both parties under PUC rules, but instead argues that they do not have statutory and constitutional standing to appeal to this Court.  In particular, Apple Hill argues that the statute affording a right to appeal to an "aggrieved" party[4] incorporates as a statutory matter a requirement that the appellant satisfy the constitutional requirements for standing, including a particularized injury in fact.  Apple Hill further argues that the appellants in this case do not have constitutional standing to pursue this appeal (and therefore lack standing under the applicable statute) because they have not shown a particularized injury rather than a general grievance.

¶ 18.    We disagree.  Even if Apple Hill's failure to challenge the PUC's decision granting the parties permissive intervention (based on its necessary determination that they established substantial and particularized interests) is not dispositive, appellants here have made a sufficient showing of a particularized interest to support their constitutional standing.[5]

¶ 19.    Implicit in Apple Hill's argument is the suggestion that the showing required to support the PUC's unappealed order granting both appellants permissive intervention is not itself sufficient to satisfy the constitutional requirement of a particularized injury in fact.  We reject this

---

[4] See 30 V.S.A. § 12 ("A party to a cause who feels aggrieved by the final order, judgment, or decree of the Commission may appeal to the Supreme Court.").

[5] Harris and the Homeowners Association's argument that their standing is "not an issue before this court" because Apple Hill did not file a cross-appeal raising the issue is mistaken.  As Apple Hill was content with the PUC's final order approving the issuance of a CPG, and on appeal seeks to preserve that same outcome, it had no need to cross-appeal.  Zullo v. State, 2019 VT 1, ¶ 14 n.6, __ Vt. __, 205 A.3d 466.  Moreover, as noted above, Apple Hill does not challenge the decision of the PUC to grant permissive intervention to both appellants, but only contests their standing to pursue their opposition on appeal before this Court.

7

premise. To intervene in a PUC proceeding, a party must demonstrate "a substantial interest which may be affected by the outcome of the proceeding." PUC Rule 2.209(B). We have further recognized that this interest must be particularized—distinguishing the would-be intervenor from the public generally. See In re Green Mountain Power Corp., 2018 VT 97, ¶¶ 17-18, __ Vt. __, 198 A.3d 36 (deferring to holdings in multiple PUC decisions that would-be intervenor before PUC must demonstrate substantial and particularized interest in proceeding to gain party status). The constitutional requirements for standing are actual injury or threat of actual injury, caused by the party against whom relief is sought, redressable by the court. Parker v. Town of Milton, 169 Vt. 74, 77, 726 A.2d 477, 480 (1998). A broad range of injuries, including injuries to aesthetic interests, can be sufficient to establish standing. Summers v. Earth Island Inst., 555 U.S. 488, 494 (2009). The PUC's decision to allow both appellants to intervene below necessarily rested on a determination that they had established substantial and particularized interests in the proceeding. Apple Hill has not contested that determination on appeal. Because that determination seems to satisfy the constitutional injury requirement, the PUC's decision granting the parties permissive intervention may be dispositive of the standing-to-appeal question.

¶ 20. Even if the statute or Constitution required something beyond the substantial, particularized interest required to support permissive intervention pursuant to PUC Rule 2.209(B), both appellants here have articulated substantial and particularized interests that might be injured by the project. Harris established a threat of actual and particularized injury: The project, if built, might increase wind speeds around her home and harm the views from her property. The Homeowners Association raised similar concerns.[6] These particularized aesthetic injuries are sufficient to establish both parties' standing to appeal.

---

[6] The actual evidence in this proceeding as to the potential particularized harms to the parties was thin. That makes sense because, as the hearing officer reminded the parties more than once, the applicable considerations in a § 248 proceeding relate to the public good, not impacts on

## II. Collateral Estoppel

¶ 21.     Turning to appellants' substantive claims, we conclude that collateral estoppel does not bar a challenge here to the claim that the Bennington Town Plan contains a clear, written community standard, and does not preclude the PUC from reaching a conclusion on the question in this case that is contrary to its determination in the Chelsea Solar case.

¶ 22.     "Collateral estoppel may apply in administrative proceedings," and because its applicability is a question of law outside the PUC's area of special expertise, we review the question of whether it applies without deference to the PUC. In re P.J., 2009 VT 5, ¶¶ 7-8, 185 Vt. 606, 969 A.2d 133 (mem.). "The purpose of collateral estoppel is to conserve the resources of courts and litigants by protecting them against repetitive litigation, to promote the finality of judgments, to encourage reliance on judicial decisions, and to decrease the chances of inconsistent adjudication." Id. ¶ 8. We will apply collateral estoppel, also known as issue preclusion,

> only when the following criteria are met: (1) preclusion is asserted against one who was a party or in privity with a party in the earlier action; (2) the issue was resolved by a final judgment on the merits; (3) the issue is the same as the one raised in the later action; (4) there was a full and fair opportunity to litigate the issue in the earlier action; and (5) applying preclusion in the later action is fair.

Trepanier v. Getting Organized, Inc., 155 Vt. 259, 265, 583 A.2d 583, 587 (1990). We generally consider the fourth and fifth criteria together, In re P.J., 2009 VT 5, ¶ 13, and in applying them, attempt to "balance our desire not to deprive a litigant of an adequate day in court against a desire

---

individual property owners. See Vt. Elec. Power Co. v. Bandel, 135 Vt. 141, 145, 375 A.2d 975, 978 (1977) (holding "proceedings under 30 V.S.A. § 248 relate only to the issue of public good, not the interests of private landowners who are or may be involved"). The aesthetic impacts of the project from the perspective of neighboring properties may be relevant to the broader aesthetics evaluation, but are not the touchstone of the § 248 analysis. See In re Rutland Renewable Energy, LLC, 2016 VT 50, ¶ 20, 202 Vt. 59, 147 A.3d 621. In fact, in opposing both parties' intervention before the PUC, Apple Hill argued that their challenges rested on private and particularized harms to them rather than the public interest more broadly.

to prevent repetitious litigation of what is essentially the same dispute." Stevens v. Stearns, 2003 VT 74, ¶ 13, 175 Vt. 428, 833 A.2d 835 (quotation omitted). Two of the five criteria are clearly met here: the question whether the Bennington Town Plan is a clear, written community standard was raised both in Chelsea Solar and in this matter, and that issue was resolved by a final judgment on the merits in Chelsea Solar.[7] We need not decide whether Apple Hill and Chelsea Solar are in privity,[8] because we conclude the fourth and fifth elements of the test are not met.

¶ 23.    In particular, Chelsea Solar did not have the kind of "full and fair opportunity to litigate the issue" that would lead us to conclude that applying issue preclusion against Apple Hill would be fair. Trepanier, 155 Vt. at 265, 583 A.2d at 587. After Chelsea Solar appealed the PUC's final order denying it a CPG, as part of which the PUC had determined that the project would violate the clear, written community standards contained in the Bennington Town Plan, the PUC encouraged Chelsea Solar to withdraw its appeal and file a new petition. One of the issues Chelsea Solar had raised on appeal was whether the Board had "improperly appl[ied] the Quechee test by holding that the Town Plan provides a clear, written community standard prohibiting the solar project in the Bennington Rural Conservation . . . zone." Chelsea Solar did as the PUC encouraged

----

[7] We reject the hearing officer's conclusion, which the PUC adopted, that "while there was a final order in the Chelsea" proceeding, it was not a final order for the purposes of collateral estoppel. Although the hearing officer observed that "the Chelsea project is not yet final" because the PUC encouraged Chelsea to withdraw its appeal and file a new, similar petition, this has no bearing on the legal question of the finality of the order. It was a final order.

[8] Shortly before oral argument, Apple Hill moved to strike portions of Harris and the Homeowners Association's reply brief. Specifically, it sought to strike statements within the section of the brief arguing that Apple Hill was in privity with Chelsea Solar, on the grounds that they were "scandalous, irrelevant and defamatory." Harris and the Homeowners Association then filed an opposition to the motion to strike. Each party asks the Court to take judicial notice of documents that they argue demonstrate the truth or falsity of the statements in the reply brief. Because we resolve the case without reference to the challenged portions of the brief, we need not reach the motion to strike, and dismiss it as moot. Meyncke v. Meyncke, 2009 VT 84, ¶ 8 n.2, 186 Vt. 571, 980 A.2d 799 (mem.).

it to do: It withdrew its appeal and filed a new petition. Given that Chelsea Solar dropped its appeal in response to the PUC's suggestion that it pursue its request for a CPG in a new and separate docket, the interests in protecting judicial economy and finality of judgments are particularly slight here, and our countervailing "desire not to deprive a litigant of an adequate day in court" is particularly strong. Stevens, 2003 VT 74, ¶ 13 (quotation omitted).

### III. Doctrine of Precedent

¶ 24. The PUC's determination in this case that the Bennington Town Plan does not constitute a clear, written community standard likewise does not run afoul of the principles of stare decisis, also called the doctrine of precedent, under which "a court must follow earlier judicial decisions when the same points arise again in litigation." Stare decisis, Black's Law Dictionary (11th ed. 2019).

¶ 25. Even assuming that the Chelsea Solar determination concerning the Bennington Town Plan is the kind of legal ruling to which the doctrine of precedent may apply, rather than a case-specific factual finding, administrative agencies "are free to depart rather freely from their precedents," and an agency may depart from precedent if it "decides that law it has previously declared is unsound and ought not to be followed." Consumer Credit Ins. Ass'n v. State, 149 Vt. 305, 308, 544 A.2d 1159, 1161 (1988) (quotation omitted). However, as a matter of administrative procedure, we generally expect agencies to provide nonarbitrary reasons for departing from their own established law. See In re Stowe Cady Hill Solar, LLC, 2018 VT 3, ¶ 21, 206 Vt. 430, 182 A.3d 53 ("We will . . . find error when a regulation is inconsistently applied [by an agency]. A fundamental norm of administrative procedure requires an agency to treat like cases alike." (quotation omitted)). Adherence to precedent does not itself bind the PUC to its decision in Chelsea Solar, although its departure from its prior holding cannot rest on bases that are arbitrary, unreasonable, or discriminatory.

## IV. Aesthetics and Orderly Development

¶ 26. We conclude that the PUC's legal conclusions as to whether the proposed project would have an undue adverse effect on aesthetics under § 248(b)(5) and would unduly interfere with orderly development of the region under § 248(b)(1) are not supported by its findings, some of which are clearly erroneous.

¶ 27. The PUC's consideration of a petition for a CPG is a "legislative, policy-making process and is thus accorded great deference." In re Cross Pollination, 2012 VT 29, ¶ 8, 191 Vt. 631, 47 A.3d 1285 (quotation omitted). We will affirm the PUC's "findings unless they are clearly erroneous" and its "legal conclusions if they are rationally derived from a correct interpretation of the law and supported by the findings." Id. (quotation omitted).

### A. Orderly Development

¶ 28. Before the PUC may issue a CPG for an in-state facility, it must find that the facility "will not unduly interfere with the orderly development of the region with due consideration having been given to the recommendations of the municipal and regional planning commissions, the recommendations of the municipal legislative bodies, and the land conservation measures contained in the plan of any affected municipality." 30 V.S.A. § 248(b)(1).

¶ 29. The PUC adopted the hearing officer's recommended conclusion that the project would not unduly interfere with orderly development under § 248(b)(1) and his findings in support of that conclusion. The hearing officer rejected the contention that the project would unduly interfere with orderly development because it deviates from the requirements in the Town Plan, relying heavily on his conclusion that the Town itself now took the position that the project would not deviate from the Town Plan's requirements. The hearing officer explained that the Town's position had "changed as a result of the Town's engagement as a party in these proceedings over the last three years, its more in-depth understanding of the Project, and its participation in the

12

amendment of the Project to overcome earlier perceived deficiencies in the Project plan." The hearing officer noted that in 2017, the selectboard voted not to oppose the project on the ground that it failed to comply with the Town Plan when filed. He added that "[t]his Town position was restated by the Town Planner, Mr. Dan Monks, in a deposition taken on September 29, 2017." The hearing officer concluded that "[h]aving reviewed the municipal and regional plans as well as the recommendations of the Selectboard and the Town Planner . . . I find that the statements of the Town Selectboard and the Town Planner are persuasive in interpreting the Town Plan" and that the Commission should conclude that the project would not unduly interfere with the orderly development of the region.

¶ 30. The PUC's conclusion that the proposed project would not unduly interfere with orderly development of the region under § 248(b)(1) rested on findings that did not support it. The selectboard's decision not to oppose the project as violating the Town Plan, on which the PUC heavily relied, does not necessarily mean anything. A decision not to oppose a project or assert that it violates the Town Plan does not mean the project comports with the Plan, or even that the Town has concluded that the project comports with the Plan. In fact, as the PUC recognized, the Town repeatedly emphasized in its response to the petitioner's post-technical hearing brief and proposed findings that "[t]he Town has taken no position as to the Project's overall compliance with the Town Plan." The Town could have any number of reasons for choosing not to oppose the project on these grounds, including conservation of its time and resources. That decision in no way supported the PUC's conclusion that the Town took the position that the project complied with the Town Plan.[9] To the extent that the PUC's conclusion that the project would not interfere

---

[9] Nor does evidence of the Town's legal counsel's advice to the selectboard prior to its vote change our view of the significance of the selectboard's decision. Counsel did not advise the selectboard that the Apple Hill project complied with the Town Plan. In fact, counsel explained that if the selectboard adopted the recommendation, the Town would not make the same claims that it made against the project as originally proposed, "but we will still continue our appearance

13

with the orderly development of the region rests on purported deference to a position the Town did not actually take, its conclusion cannot stand.

¶ 31.   We remand for the Commission to assess the impact of the project on the orderly development of the region in light of the Town Plan without consideration of the selectboard's purported position on the subject.[10]

### B.  Aesthetic Effect

¶ 32.   The PUC's conclusion that the project would not have an unduly adverse aesthetic effect rests in part on its determination that the Town Plan does not constitute a clear, written community standard intended to preserve aesthetics.  This conclusion rests on clearly erroneous findings.

¶ 33.   The PUC uses a modified version of the Quechee test to determine whether a project would have an undue adverse effect on aesthetics under § 248(b)(5).  See In re Quechee Lakes Corp., Nos. 3W0411-EB, 3W0439-EB, slip op. at 19-20 (Vt. Envtl. Bd. Nov. 4, 1985); In re Rutland Renewable Energy, LLC, 2016 VT 50, ¶ 14, 202 Vt. 59, 147 A.3d 621 (noting PUC "has adopted a modified version of the Quechee test for determining aesthetic impact").  The test

---

and make sure that the project remains in conformance with the Town Plan by virtue of conditions that assure that the things that this board has cared about and directed previously are accomplished."

[10]   On remand, to the extent the PUC relies on the positions taken by the Town Planner, it should be specific about what positions it understood the Town Planner to take and what authority it understood the Town Planner to have.  The Town Planner, who was testifying as the deponent in a Vermont Rule of Civil Procedure 30(b)(6) deposition of the Town of Bennington in this matter, said there was nothing in the Bennington Town Plan that "automatically" or categorically prevents the development of commercial-scale solar facilities in the Rural Conservation District.  When presented with various simulated views of the proposed Apple Hill project, which were prepared by Apple Hill, the witness emphasized that the selectboard had not made individual findings as to the project's compliance with the Town Plan from various perspectives, but had simply withdrawn the Town's objections based on any noncompliance with the Town Plan.  He confirmed that as an individual it appeared to him that the perspectives provided to him did not appear to violate provisions in the Town Plan.

first asks whether the project will have an adverse effect on the aesthetics of the area. Rutland Renewable Energy, 2016 VT 50, ¶ 14. If it will, the test then asks if the effect is undue. Id. An adverse effect is not undue if the project will "not violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area" and will "not offend the sensibilities of the average person," and the applicant will "take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings." Id. (quotation omitted). Town plans may be sources of clear, written community standards. See In re Rinkers, Inc., 2011 VT 78, ¶ 10, 190 Vt. 567, 27 A.3d 334 (mem.).

¶ 34. The hearing officer here concluded that the project would have an adverse aesthetic effect, but that it would not be undue, in part because the project would not violate a clear, written community standard intended to preserve the aesthetics or scenic beauty of the area. He rejected the notion that the Bennington Town Plan provided a clear, written community standard because he reasoned that "the Town Plan is being treated like a zoning ordinance and has been subject to varied application by the Town." The hearing officer based this conclusion on his assessment that the Town had changed its position as to whether the Town Plan permits development of commercial solar-generation facilities in the Rural Conservation District. The hearing officer acknowledged that the Town had expressly asserted that its resolution not to oppose Apple Hill did not mean that it had taken any position as to the project's compliance with the Town Plan. But he concluded that the Town's decision not to oppose the Apple Hill project demonstrated that the Town was failing to "clearly and consistently apply the language of the Town Plan," and "[a]s a result, the 2010 Town Plan can no longer serve as a clear, written community standard that unequivocally identifies the Rural Conservation District as a resource that needs protection."

¶ 35. In addition to adopting the hearing officer's findings and proposed conclusions, the PUC specifically addressed and rejected the argument that the PUC's Chelsea Solar decision

compels the conclusion that the Town Plan contains a clear, written community standard. The PUC reasoned that, in contrast to Chelsea Solar, "there is evidence that the Town has selectively applied the Town Plan's design standards for the Rural Conservation District by approving other large-scale commercial solar projects in the District." It added that "the Town has determined that the Commission was incorrect in [Chelsea Solar] when the Commission determined that the Town Plan prohibited commercial alternative energy projects in the Rural Conservation District." Therefore, it concluded that "the Town Plan language that [the PUC] relied on in [Chelsea Solar] does not now serve as a clear, written community standard intended to preserve the aesthetics or scenic beauty of the area."

¶ 36. We do not dispute the PUC's legal determination that, even where standards in a written town plan appear to be clear on their face, if a town applies those standards only selectively or arbitrarily, the standards may lose their force as clear, written standards distinguishing acceptable from undue adverse effects. But we conclude that the record does not support the finding that the Town applied the standards in its Town Plan concerning the Rural Conservation District inconsistently or selectively such that the standards do not constitute clear, written standards. We accordingly direct the PUC to determine whether the project violates those standards in assessing whether the project's adverse effects are undue.

¶ 37. The evidence the PUC appears to have relied on in concluding that the Town inconsistently applied the Rural Conservation District standards are the Town's decision not to affirmatively argue that the Apple Hill project runs afoul of the Town Plan, evidence of opinions and advice the Town's counsel gave to the selectboard before it made that decision, and testimony of the Town Planner. None of these sources of evidence demonstrates that the Town inconsistently or selectively applied the Town Plan in relation to the Rural Conservation District.

16

¶ 38. First, as noted above, the substantive significance of the Town's decision not to oppose the Apple Hill project on the basis of the Town Plan is minimal. The Town's decision not to oppose the Apple Hill project on the basis of the Town Plan does not signal a change of position as to the impact of the Town Plan because it does not signal a position at all.[11] As noted above, the Town expressly disclaimed any intent to take a position. Even if a factfinder could attribute substantive significance to the Town's decision, it is difficult to discern how the Town's decision not to affirmatively argue that the project would violate the Town Plan—made after Apple Hill revised its proposal in response to various objections—reflects a change in position as to the requirements of the Town Plan rather than a determination that the proposal, as revised, would not run afoul of the Plan's requirements. The findings do not explain how the Town's position supports the inference the PUC relied on.[12]

¶ 39. Second, even assuming that the Town's counsel's out-of-court opinions and advice to the selectboard were proper considerations for the PUC in assessing whether the adverse effect of the project would be undue, counsel's statements do not support a finding of inconsistent application of the Town Plan standards for Rural Conservation Districts. The most the PUC could infer from counsel's remarks is that counsel advised that, in light of other development in the district, the Town's past support of other solar projects in the Rural Conservation District, and zoning practices concerning other commercial development in that district, the Town could not

---

[11] For that reason, we leave for another day the question of whether and how a town selectboard's interpretation of its town plan should inform a determination of a project's compliance with clear, written community standards for purposes of the Quechee test in the § 248(b)(5) context.

[12] To be clear, the Town itself never suggested that it did not view the Town Plan as establishing a clear, written standard designed to protect aesthetics. In a post-hearing filing the Town took the position, taken now by Harris and the Homeowners Association, that collateral estoppel and adherence to precedent preclude relitigation of the question whether the Bennington Town Plan contains a clear, written community standard.

reasonably take the position that the Town Plan <u>categorically</u> precludes alternative energy projects in the Rural Conservation District. But there is no evidence in the record that this position is inconsistent with a prior position taken by the Town. In fact, the Town's lawyer specifically stated, in the same discussion apparently relied on by the hearing officer, that the Town has never argued to the PUC that the Town Plan bars alternative energy projects entirely in the Rural Conservation District. Although the PUC concluded in <u>Chelsea Solar</u> that only residential development was allowed in the Rural Conservation District pursuant to the Town Plan, there is no evidence that the Town advocated this position. In fact, Apple Hill's brief highlights the fact that the Town did <u>not</u> advance the position adopted by the PUC in <u>Chelsea Solar</u> that solar projects are categorically prohibited in the Rural Conservation District.

¶ 40. Finally, the Town Planner's testimony does not support the finding of inconsistent application of the Town Plan upon which the PUC relied in declining to consider the Plan as a source of clear, written standards. The Town Planner confirmed that the Town Plan does not categorically preclude solar projects; as noted above, there is no evidence that this reflects a new or inconsistent position by the Town.[13]

¶ 41. In concluding that the evidence does not support the PUC's conclusion that the Town Plan does not constitute a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area, we do not mean to suggest that the project necessarily runs afoul of that standard. We only address the PUC's threshold determination that

---

[13] Moreover, the PUC's quote of the Town Planner as saying that there was "nothing in the Town Plan of 2010 which is violated by the project" was taken out of context. The Town Planner was asked whether, based on one simulated view of the project in which the project was not prominently visible, "there's nothing in the Town Plan of 2010 that is violated by the Project," and the Town Planner replied, "based on this perspective, yes." The PUC's reinterpretation of this statement into a conclusion by the Town that "there is nothing in the 2010 Town Plan that is violated by the Project" was clearly erroneous.

the Town Plan does not constitute a clear, written community standard intended to protect aesthetics, and do not reach the question whether the project runs afoul of that standard. That is a question the PUC must address on remand. We simply conclude that the PUC erred in declining to actually apply the standard in the Town Plan in evaluating whether the project's adverse effect would be undue.[14]

Reversed and remanded for further proceedings consistent with this opinion.


FOR THE COURT:


_____

Associate Justice

---

[14] In addressing this question, the PUC should bear in mind that even if the Town Plan does not categorically prohibit commercial development of alternative energy-generation facilities in the Rural Conservation District, it must still address whether this particular project would run afoul of the specific design standards in the Rural Conservation District: "Development in this area cannot be sited in prominently visible locations on hillsides or ridgelines, shall utilize earth tone colors and non-reflective materials on exterior surfaces of all structures, and must minimize clearing of natural vegetation." In its decision granting the CPG, the PUC included a number of findings directed at these factors, but did not reach any conclusions as to compliance with the Town Plan once it concluded that the Town Plan did not have the status of a clear, written community standard because it had not been applied consistently.